THE STATE ex inf. JESSE W. BARRETT, Attorney-General, ex rel. RICHARD CALLAHAN, v. ALEXANDER MAITLAND, et al.

In Banc, December 20, 1922.

1. **LEGISLATIVE POWER:** Condemnation. The right to condemn property for a public use is a legislative function, and the State, by its Constitution or laws, may delegate that power to a city, and the city, through the exercise of its legislative power, selects and designates the property to be condemned. But a charter amendment, which creates a commission with full power to condemn property for a waterworks system, is a re-delegation of such power, and it is a matter of serious doubt whether the city has the right, by either ordinance or charter, to re-delegate to a commission power to designate and select the property to be condemned.

State ex inf. Attorney-General v. Maitland.

2. ———: **Water Rates.** Likewise the power to fix water rates for public consumers is purely a legislative function.

3. **CHARTER AMENDMENTS: New Sections of Constitution: Notice of Election.** New ·Section 16 of Article IX of the Constitution added in 1920 and declaring that "the notice for any election provided for in this section shall be published for at least three weeks in at least one newspaper printed in such city" has no reference to an election to add two amendments to the Kansas City Charter of 1908. but only to an election to adopt or reject a full charter framed by a commission of thirteen citizens; and Section 17, adopted at the same time and providing that "amendments of any charter framed and adopted under the authority of Section 16 of. Article IX of this Constitution may be submitted to the electors by a charter commission in the manner provided for the submission of a complete charter" cannot be made to apply to an amendment to the Kansas City Charter of 1908, for by its very terms it limits its force and effect to amendments to charters "framed and adopted under the authority of Section 16," as is shown by the words "of this Constitution." Consequently a notice by publication for an election to adopt an amendment to the charter of 1908, given in the manner prescribed by said Section 16, was void.

*Held*, by DAVID E. BLAIR, J., dissenting, with whom HIGBEE, J., concurs that neither the Kansas City Charter of 1908 (Sec. 34, Art. 18) nor the old section of the Constitution (Sec. 16, Art. 9), being almost in the exact same language, made provision for an amendment to the charter proposed by the petition of qualified voters of the city, as does new Section 17 of Article IX of the Constitution, and in the absence of a direction in the existing charter concerning the manner of giving notice of an election to vote upon a charter amendment proposed by qualified voters, the legislative authority of the city has the right to provide for any sort of reasonable notice, and if it required the giving of the notice specified by said new Section 16 such notice should be regarded as both reasonable and sufficient, because it meets the constitutional standard.

4. ———: ———: ———: **Conflict Between Constitutional Amendments and Charter.** The constitutional amendment (Sec. 16, Art. IX, adopted in 1920) providing that "the notice of any election provided for in this section shall be published for at least three weeks in at least one newspaper printed in such city, . . . such publication . . . to be made at least once each week, . . . the last publication to be within two weeks of the date of the election" did not conflict with a provision of the exising city

State ex inf. Attorney-General v. Maitland.

charter (Sec. 34, Art. 18) that "this charter may be amended at any time by a proposal therefor . . . published for at least thirty days in three newspapers, . . . one of which shall be printed in the German language." The constitutional amendment fixed minimum requirements, and thereby impliedly permits longer and more numerous publications, and there being no express repeal of the charter provision legal notice in harmony with it may still be given; and in view of the fact that said constitutional amendments (Secs. 16 and 17, Art. IX, as adopted in 1920) did not apply to amendments to a previously adopted charter, publication of an election for the adoption of a proposed amendment to the Charter of 1908 must conform to said charter provision, and if it meets only the minimum requirements of said constitutional amendment the election is void.

*Held*, by DAVID E. BLAIR, J., dissenting, with whom HIGBEE, J., concurs, that the adoption of new Sections 16 and 17 of Article IX of the Constitution in 1920 repealed old Section 16, and if new Section 16 applies only to an election to adopt a complete charter there is no method by which a then existing city charter can be amended.

5. ———: ———: ———: **Conflict Between Charter Provision and Act of 1921.** The Act of July 14, 1921 (Laws 1921, Ex. Sess., p. 110), even if it repealed the existing provisions of the Charter of Kansas City (Sec. 34, Art. 18, Charter of 1908) providing for the publication of notice of an election, did not apply to an election held on November 2, 1921, for the adoption of an amendment to the city charter. Said act did not relate to "the immediate preservation of the public peace, health or safety," and although it contained an emergency clause attempting to put it into immediate effect, it did not become effective before November 2, 1921.

6. **ELECTION: Ballots: Omission from Title: Legal Fraud.** A ballot declaring that "it is a proposed amendment" to the city charter, repealing a certain article and adopting two new articles in lieu thereof "relating to the establishment of a water commission, prescribing the powers and duties thereof, and providing for a waterworks system, and to the establishment of a board of fire commissioners, prescribing the powers and duties thereof, and providing for a fire department system," but containing no words informing the voter that the water commission was to be composed of the four respondents and that by voting for said amendment they were electing them to office for terms in excess of the statutory period and empowering them to name their own successors, was so misleading as to amount to a legal fraud, and invalidated the election of respondents.

7. ——: ——: **Double Proposition.** A double proposition by which the voter, in order to obtain what he wants, must vote for what he does not want, whether it relates to creating debts or an amendment to a city charter or the organic law, is close akin to legal fraud, and invalidates the adoption of the matters contained in the propositon. A proposed amendment to a city charter creating (1) a water commission and (2) a. fire department and (3) electing the four respondents to fill the office of water commissioners was double, for the voter was compelled to vote yes or no on three vital propositions by a single vote.

*Held*, by DAVID E. BLAIR, J., dissenting, with whom HIGBEE,
   . J., concurs, that the proposed amendment repealed an existing article of the charter, and adopted two others in lieu thereof, creating a water department and a fire department, and the two matters are inseparately linked together, and to have separated them into two propositions, one· for a water system and the other for a fire department, would have been, by the rejection of one or the other, to have invited public disaster to a great city, and the usual reasons against doubleness, namely, sound public policy, argue for the submission of both matters as one proposition, connected together as a necessary whole; and the provision naming respondents as the first water commissioners was also a dependent proposition, although it need not necessarily have been included.

*Quo Warranto.*   .

WRIT OF OUSTER AWARDED.

*Jesse W. Barrett,* Attorney-General, and *A. R. Mc-Clanahan* and *Frank W. McAllister* for relator.

(1) The provisions of the ordinance prescribing the manner of publication of the proposed charter amendments, or the proposal therefor, are in violation of Section 34 of Article XVIII of the Charter, and the publication made is insufficient under the·charter.

Neither Section 16 nor 17 as adopted November 2, 1920, prescribes the manner of publication of notice of the submission of charter amendments which are proposed by the legislative authority of the city or by petition of the qualified voters. The charter which it was

proposed to amend was not "framed and adopted under the authority of Section 16 of Article IX" adopted November 2, 1920, but was framed and adopted long before the amendment of 1920, under the constitutional provision then repealed. Neither were the proposed amendments submitted "by a charter commission." It appears from defendants' answer or return that the publication of the proposed charter amendments was made in only one paper and for only three weeks, in accordance with the provisions of Section 16 of Article IX of the Constitution as adopted November 2, 1920, and that neither the amendments, nor proposals therefor, were published for thirty days in three newspapers of the largest circulation in the city as required by the charter provision. In the absence of a prohibitive constitutional or legislative provision a charter provision directing the method of publication and the submission of amendments to the charter will prevail, and the ordinance providing for publication in a single newspaper for only three weeks being in conflict with the charter, is and was void. Likewise the publication itself was insufficient because the manner of publication prescribed by the charter was not followed or complied with. The situation here does not present a case of a defective compliance with the prescribed method of publication, which is aided by the rule that a substantial compliance with the law is sufficient, but a failure to attempt to comply with the law, and there can be no substantial compliance with the law when there was no effort or purpose to comply with it. In legal effect, there was no publication of the proposed amendments, or the proposal therefor, or of any notice of the special election. (2) The ordinance submitted, and the ballot contained, two or more separate, distinct and independent propositions or measures as a single question, thereby compelling the voter to accept all or reject all. 9 R. C. L. p. 1059; 20 C. J. p. 149; 21 Am. & Eng. Ency. Law (2 Ed.) 47; State ex rel. v. Allen, 186 Mo. 673; State v. Gordon, 223 Mo. 1, 33; State ex rel. v. Wilder, 217 Mo. 261. (3)

Defendants were neither elected nor appointed members of the water commission as required by Section 14 of Article IX of the Constitution. State ex rel. v. Bus, 135 Mo. 331; Gracey v. St. Louis, 213 Mo. 394; 22 R. C. L. p. 372; State ex inf. v. Washburn, 167 Mo. 692; Meechem on Public Offices and Officers, sec. 102. (4) The term of office fixed for defendants being for a longer period than four years is in violation of Section 14 of Article IX of the Constitution. It is hornbook law that city charters as well as ordinances are subject to and must be consistent with the Constitution and laws of the State. It is so expressly stated in the amendment to the Constitution adopted in 1920, but would be the law whether recited therein or not. Aside from this provision, the charter amendment does not fix the term of office of defendants, nor is it fixed by any other provision of law, state or municipal. If they are entitled to the offices, then they have no fixed term. They are not serving at the pleasure of the appointing power, because they have not been appointed by any authority which can end their term by appointing their successors. Under these circumstances, if they are in office at all, they are in for life, subject only to removal for the cause specified in the charter amendment. (5) The naming of defendants as individuals to constitute the water commission and fixing their terms of office by name is special legislation and is an attempt to grant to defendants special and exclusive rights and privileges, in violation of Section 53 of Article IV of the Constitution. The Constitution prohibits local or special laws, and the provisions of this section are held to apply to municipal legislation. Ex parte Lerner, 218 S. W. 331; Hays v. Poplar Bluff, 263 Mo. 516; St. Louis v. Construction Co., 244 Mo. 479; St. Louis v. Russell, 116 Mo. 248; State ex rel. v. Taylor, 244 Mo. 477. Lewis's Sutherland on Statutory Construction, sec. 199, defines special laws as "those made for individual cases, or less than a class." See State ex rel. v. Gordon, 236 Mo. 142.

*John B. Pew, Cooper, Neel & Wright, J. A. Harz-feld,* and *Scarritt, Jones, Seddon & North* for respondents.

(1)   Section 34, Article 18, Kansas City Charter, relative to the method of amendment. of the city charter, was superseded and rendered of no effect and repealed by the adoption of the amended Sections 16 and 17 of Article IX of the Constitution at the fall election of 1920; and therefore when it came to amending the city charter in November, 1921, the method rightfully pursued, in submitting the amendment, was that prescribed in the Constitution (Amended Secs. 16 and 17, Art. IX) and not the defunct charter method (Sec. 34, Art. XVIII, City Charter 1908).   State ex inf. Major v. Kansas City, 233 Mo. 162; State ex rel. Wiesenthal v. Denny, 4 Wash. 135; City of East St. Louis v. People, 124 Ill. 655; City of East St. Louis v. United States ex rel. Amy, 120 U. S. 600; Neal v. State of Delaware, 103 U. S. 370; State ex rel. Ross v. Kelly, 45 S. C. 457.   (2)   The method of submitting charter amendments to the voters by publication in one newspaper instead of in three, including one in the German language as required by the city charter, is clearly stated in Sections 16 and 17 of Article 9 of the Constitution, which sections were adopted at the general election in November, 1920, and the method so stated in those sections was followed in the special charter election of November 22, 1921.   Indeed, this proposition does not seem to be questioned by the relator: his only contention being, as we understand him, that the charter method and not the constitutional method of publication should have been followed.   Secs. 16 and 17, Art. IX, Mo. Const. Amend.   1920; Laws 1921, Extra Sess. p. 110.   (3)   The charter amendment of 1921 repealing Article XI of the previous charter, which dealt with the department of fire and water as a unit, and the adoption in lieu thereof of two articles designated as Article XI and Article XI-A, which effectuated a separation of what had theretofore

been one administrative department into two administrative departments, comprehends but one subject. And that subject is one of purely local municipal affairs and of business administration. No question of the issuance of bonds or of taxation was or is involved. And in this view neither the amendment, nor the ballot submitting it, is subject to just criticism on the ground or infirmity of so-called doubleness. State ex rel. Memphis v. Hackmann, 273 Mo. 67; State ex rel. Mercer County v. Gordon, 242 Mo. 624; State ex rel. Canton v. Allen, 178 Mo. 575; Sanders v. Lacks, 142 Mo. 255, 263; Horsefall v. School Dist., 143 Mo. App. 541; State ex rel. v. Stouffer, 197 S. W. (Mo.) 248; Russell v. Croy 164 Mo. 69, 96; State ex rel. Atty. Gen. v. Winnett, 78 Neb. 379; State ex rel. City of Bethany v. Allen, 186 Mo. 673; State ex. rel. Pike Co. v. Gordon, 268 Mo. 321; State ex rel. v. Wilder, 217 Mo. 261; State ex rel. School Dist. v. Gordon, 223 Mo. 1, 33, (dissenting opinion); Sec. 16, Art. IX, Mo. Const. Amd. 1920; State ex rel. v. Riplinger, 30 Wash. 281; State ex rel. Duniway v. City of Portland, 65 Ore. 273; Thompson Houston Elec. Co. v. City of Newton, 42 Fed. 723; State ex rel. Wiesenthal v. Denny, 4 Wash. 135; People ex rel. Elder v. Sours, 31 Colo. 369; Gabbert v. Ry. Co., 171 Mo. 84; Gottstein v. Lister, 88 Wash. 462; State ex rel. Hay v. Alderson, 49 Mont. 387; State ex rel. v. Morris, 43 La. Ann. 590, 659; Loubaugh v. Cook, 127 Iowa, 181; State ex rel. Hudd v. Timme, 54 Wis. 318. (4) The people of Kansas City by their duly enacted charter amendment of 1921 have only exercised customary and well recognized govermental rights in naming the commissioners whom they desired to rebuild the water plant, in and as a part of that amendment, and so we submit the charter amendment is not void on the ground that the water commissioners are named in that amendment. Kansas City Charter, art. 4, sec. 1 and sec. 4; City of Americus v. Perry, 114 Ga. 871; Lambert v. City of Norman, 119 Ga. 351; State ex rel. Fletcher v. Ruhe, 24 Nev. 251; State of Nevada ex rel. Rosenstock

v. Swift, 11 Nev. 128; State ex rel. Atty. Gen. v. Winnett, 78 Neb. 379. (5) It is contended by the relator that there are no water commissioners, because those named in the charter amendment are to serve until the third Monday in April, 1928, and that this amendment creates offices with terms longer than that fixed in Section 14, Article 9, of the Constitution, that is, longer than four years, but this contention is not well founded. Cooley, Const. Lim. (5 Ed.) p. 212 (*p. 178); State ex rel. Bray v. Long, 21 Mont. 26; Sinking Fund Comrs. v. George, 104 Ky. 260; Sec. 14, Art. 9, Mo. Constitution; Kansas City v. Marsh Oil Co., 140 Mo. 453; Kansas City v. Woerishoeffer, 249 Mo. 1; State ex rel. Realty Co. v. Thomas, 278 Mo. 85; Brunn v. Kansas City, 216 Mo. 108; Kansas City v. Bacon, 147 Mo. 257; Laws 1917, p. 433; 1 Lewis on Eminent Domain (3 Ed.) sec. 268, p. 675. (6) The people of Kansas City acting through charter authority are not restrained from their fixed purpose and desire of naming certain well known Kansas Cityans as water commissioners and providing that they may exercise their functions until 1928, that is, until the water works plant is built, by Section 53 of Article 4 of the Constitution inhibiting local or special laws.

GRAVES, J.—After the rejection of one opinion this case has fallen to me for disposition.

*Quo Warranto ex informatione* the Attorney General, at the relation of one Callaghan. The respondents, Maitland, Edwards, Rotchschild and Bryant, claim to be what is known as the Water Commissioners of Kansas City. By this action it is charged that these parties as the so-called Water Commission of Kansas City, or Water Commissioners of Kansas City, have usurped and exercised powers not granted to them by authority of law, and ouster is prayed.

In 1921 two amendments to the Kansas City Charter were proposed, and by ordinance submitted to the

voters of the city. The real purpose of the present action is to test the validity of one of these amendments here challenged. Its validity is not only challenged upon the ground that it was not legally submitted and adopted, but that the very essence and substance of the so-called amendment did violence to well fixed constitutional and legal provisions. By this Amendment No. 1 (which was one of the two submitted) Article XI of the existing charter was repealed, and instead two new Articles were proposed (Article XI and Article XI-A), and by said proposed Article XI a department of city government known as the Water Commission was created, defendants by name were designated as the members of such commission, their salaries and their terms of office fixed, as well as provision made for succession in office. It granted to them the unusual power of eminent domain, the power to fix water rates, the control over the receipts and disbursements of the department. In fact, it placed the waterworks of the City beyond the control of the legislative or executive departments of the city. We hope not to make our language too strong, but a reading of the particular alleged charter provision is sufficient to cause one who has deep faith in constitutional and fundamental law "to stop, look, and listen," if we may be permitted to borrow the language of the law of negligence in a case like the one now under consideration. We shall not undertake to here detail all the provisions of the proposed Article XI. Article XI-A created a fire department, under the executive branch of the city government. Both of these matters were submitted to the voters in a single ballot in this form:

"Charter Amendment Ballot.

"Charter Amendment No. 1.

"The proposed Amendment to the Charter of Kansas City, Missouri, by repealing Article XI of said charter and adopting two new articles, in lieu of said Article XI, to be known as Article XI, with Sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20, and Article XI-A with Sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11, relating to the establishment of a Water Commission, prescribing the powers and duties thereof, and providing

State ex inf. Attorney-General v. Maitland.

for a water works system, and to the establishment of a Board of Fire Commissioners, prescribing the powers and duties thereof, and providing for a fire department system.
"YES                          No."

In addition to the creation of two distinct departments of the city by the use of a single ballot, the same ballot was made to elect the four respondents by name, as the Water Commission, or Water Commissioners, if such ballot was affirmatively voted. The urged defects both in adoption and substance can best be stated in the opinion in the disposition of the points made.

After the pleadings upon both sides were in, the issues were made by motion for judgment upon the pleadings. In the situation we have issues of law only.

I. There are some things, apparent upon the face of this alleged charter Amendment No. 1 (we are not concerned with Amendment 2), which may not be specifically raised in the briefs, but may be covered by the broad issues of the pleadings. Some of those Legislative things are so far reaching as to deserve note Power. in any opinion written in the case. This amendment at least creates a separate department of the city government. In Section 8 it is said, upon the matter of acquiring property by condemnation, as follows: "The commission shall have full charge . . . of the acquisition and establishment by . . . condemnation . . . of all property for the waterworks system or any part thereof or appurtenances thereto, except as provided in Section 2, Art. XI-A, of the charter as here amended."

It is true that Section 15 says that the commission shall proceed in the name of the city, but this does not answer the real trouble with these provisions as to condemnation. The State, by Constitution or laws, can commit the delicate matter of condemnation to the city, but in such instance the city through its legislative power selects and designates the property to be condemned. Not so under this charter. The commission selects and designates the property to be condemned, and proceeds

in the name of the city to do so.   The State grants this right and power of selection to the city, and not to any particular department of the city.   Theretofore it has been (and we think rightfully) exercised through the legislative department (Sec. 1, Art. VI, K. C. Charter of 1908), but under this charter amendment the right delegated by the State to the city has been re-delegated to the commission.

The grant of power to condemn comes from the State to the city by and through the constitutional provisions authorizing the framing of a charter, but we emphasize that it is a grant or delegation of power to the city, and not to any board or commission of the city. The right to condemn has been properly classed as a legislative function.   The grant may be in general terms, as when the Legislature gives power to corporations to condemn private property for a public use, or it may be in specific terms, as where by ordinance a city directs the condemnation of specific property for a specified public purpose.   But in either event it is a right coming through the legislative branch of the government.   The city acquired its right to deal with the subject from the State, as above indicated, but we have most serious doubt of the right of the city by either charter or ordinance to re-delegate this power to a commission.   We mean the power to determine upon and select the property to be condemned.   Again this alleged charter provision authorizes this commission to fix water rates for the public consumers of the city.   [Sec. 10 of Amendment.]   This is a purely legislative function.   [3 Dillon on Municipal Corporations (5 Ed.) sec. 1303, p. 2133.]   It is there said: "A further instance of the exercise of legislative authority in dealing with public service corporations is the exercise by a city of delegated authority to regulate the rates to be charged to the municipality and individual consumers for water or light.   Such power is clearly legislative and governmental in its character, being intended for the prevention of abuses; and in the exercise

of the power it is impossible to regard the municipality as acting in a private and proprietary capacity.''

By this amendment of the charter the legislative function of fixing rates is conferred upon the commission, which is again the re-delegation of legislative powers and functions. Not only so, but if this commission has this right its action is not even reviewable by the Public Service Commission. [Laws 1917, p. 433.]

Other suggestions might be made, but these suffice on this point.

II. The first question argued fully in the briefs is as to whether or not the notice of the election was sufficiently published, and correlated matters. New Section 16 of Article IX of the Constitution, adopted November 2nd, 1920, has reference solely to the framing (by a charter commission of 13) and the adopting of a new charter. It has no reference whatever to amendments to an existing charter. This Section 16 provides for notice as follows:

Notice of Elections: New Constitutional Sections.

''The notice for any election provided for in this section shall be published for *at least three weeks in at least one newspaper printed in such city,* which newspaper shall have a bona-fide sale or circulation in such city of at least two thousand copies of each issue, in which such notice is published, and which newspaper has been published continuously for fifty-two weeks next before the publication of such notice, such publication of such notice to be made at least once each week and on the same day of the week in each of said three weeks, and the last publication to be within two weeks of the date of such election.''

Strictly speaking this provision as to notice has no reference to an election such as was held. It has reference to an election held to adopt or reject a full charter, framed by a charter commission of thirteen citizens. It does not squint at an election held to amend an existing charter.

Nor does new Section 17 of the Constitution (Laws 1921, p. 702) apply to this election. The charter being amended was one adopted in 1908. New Sections 16 and 17 were not adopted until November 2, 1920, and could not become and be a part "of this Constitution" until after that date. We quote the term "of this Constitution" because strictly speaking new Section 17 might be construed to refer to charter adopted after November 2nd, 1920. This because new Section 16, referred to in the first two lines of the new Section 17, was not a part "of this Constitution" until November 2nd, 1920. New Section 17 says, as to amendments: "Amendments of any charter framed and adopted under the authority of Section 16 of Article IX of this Constitution may be submitted to the electors by a charter commission in the manner provided for the submission of a complete charter. Amendments may also be proposed by the legislative authority of the city or by a petition of not less than ten per cent of the qualified voters of the city, filed with the board of election commissioners, or officials having charge of municipal elections in such city, setting forth such proposed amendment."

The charter adopted in 1908 was not one adopted "under the authority of Section 16 of Article IX of *this Constitution*" if the word "this" be construed to mean and refer to the Constitution as it stood after November 2nd, 1920. It is therefore a serious question as to whether or not any previously adopted charter is covered by this Section 17. The word "this" is used in the Constitution as amended, and not in the original instrument. In fact this Section 17 appears as a new section and has no reference to the subject contained in old Section 17 of the Constitution, which was repealed. The subjects covered by the old and new Section 17 are entirely different. So different that we doubt whether the people of the State would have repealed old Section 17, had they really been advised as to subject-matter

covered by it.   But be this as it may be, we proceed to get the construction to be given to this new Section 17, when considered along with new Section 16.   Section 16, now in the Constitution, is radically different from old Section 16, if this fact be material.   The real point is whether or not new Section 17, which is the only one dealing with amendments, has any reference to previously adopted charters. We think not. By its very terms it limits its force and effect to charters adopted under new Section 16, as is clearly shown by the use of the words "this Constitution."   It could have no reference to charters adopted under the Constitution prior to the Amendment of November 2nd, 1920.   As to such previous charters, it would seem to leave them to be amended in the manner and form prescribed therein. The manner for amending the charter of 1908 is prescribed in Section 34 of Article 18 thereof.

It is not an unreasonable construction of new Sections 16 and 17, adopted as one amendment to the Constitution, to say that the people intended (1) that new charters should be thereafter adopted as in new Section 16 prescribed, and (2) that new charters so adopted should be thereafter amended as in said new Section 17 provided.   In fact, the language used forces us to the construction that the amendments referred to in new Section 17 have reference solely to amendments to charters which were adopted under new Section 16, and not to previously adopted charters.   As to previously adopted charters it could well be said, and we believe that it should be said, that these new constitutional provisions left them to be amended in manner and form as in such old charters provided.   Otherwise we would give no heed to the peculiar words used in the first few lines of new Section 17, set out hereinabove.   If this be the true construction, then the whole proceeding involved in this case is void.   It would have been much easier for the Constitution-makers to have used language to cover all charters, rather than to have made the designa-

tion which they did, i. e. "Amendments of any charter passed and adopted under the authority of Section 16 of Article IX of *this* Constitution," etc. This construction would render the notice in this case void, because under such construction the notice should measure up to the terms of Section 34 of Article 18 of the Charter of 1908.

III. The foregoing is sufficient to determine the question of notice, but we go a step further in the matter. New Section 17 prescribed no' requirements for notice except by reference of new Section 16. That portion of new Section 16 with reference to notice we have set out supra.

Conflict Between Charter Provision and Constitutional Amendment.

By Section 34, Article 18, of the charter of 1908 it is provided: "This charter may be amended at any time by a proposal therefor made by the law-making authorities of the city, published for at least thirty days in three newspapers of the largest circulation in the city, one of which shall be a newspaper printed in the German language, and accepted· by three-fifths of the qualified voters of the city voting at a general or special election. The city may, by ordinance, subject to all laws, provide as to the form of submitting to such voters at any election any proposed amendment, and for ascertaining the results of the election on such proposed amendment, and making proper record of the fact."

If this charter provision in so far as it goes to the notice to be given is not repealed by reason of the adoption of new Sections 16 and 17 of Article IX of the Constitution on November 2nd, 1920, then it was in force and effect at the date of this election, and its terms should have been followed, and there is no substantial claim that they were followed. There is no express repeal, and if this section of the old charter has been nullified by the amendment to the Constitution on November 2nd, 1920, it is because there is conflict between the two pro-

296 Mo.—23.

visions. Let us see if there is conflict. Under the new Section 16 of the Constitution, the notice must be published "at *least* three weeks in at *least* one *paper*, . . . the last publication to be *within* two weeks of the date of the election." As to length of time and the number of papers this provision only fixes a minimum. If the notice required by Section 34 of Article 18 provided for a notice below this minimum, then there would be conflict, and the charter provision would have to yield to the constitutional provisions. The fixing of these minimums, however, did not prevent the city from giving longer and fuller notice of such an election. The language used in fixing these minimums impliedly permits longer publication, and more voluminous publication. [Pitman v. Drabelle, 267 Mo. l. c. 87.] The term *"within two weeks"* fixes a maximum time from the last publication to the day of the election. Does the charter provision, Section 34 of Article 18, conflict? As to time of publication the charter says thirty days, which is longer, and not less than three weeks. As to number of papers, the charter provides for three or a greater publication, which is more publication than the minimum required. As to frequency of the publication the charter provides that it shall be "published for at least thirty days" which is simply more than the minimum fixed in new Section 16 of the Constitution which is "at *least* once each week."

We are cited to the case of Southworth v. Mayor of Glasgow, 232 Mo. 108, which opinion was a product of the writer. The language used in this charter is very different from the language used in the Glasgow Case. This charter says that the notice must be published "for at least thirty days," whilst the statute we construed in the Glasgow Case said "not less 'than fifteen days' previous notice shall be given by publication in some newspaper." There is a vast difference between a law which says that a notice shall be published "for thirty days" and the language of the statute in the Glasgow

Case. The latter is satisfied by one publication, the former is not. Had this charter required "thirty days' notice" as did the statute in the Glasgow Case, the cases would be parallel. The charter not only dealt with the length of the notice, but the frequency of its publication. The statute did not deal with the frequency of publication.

In this case the Constitution deals with minimums in the matters above discussed, and a conflict does not follow merely because the charter exceeds these minimums. This is clearly the rule in Pitman v. Drabelle, 267 Mo. l. c. 87. So that upon the matter of notice there is no conflict between the charter provision and new Section 16 of the Constitution. The charter covers all the minimums mentioned in the Constitution, and simply going beyond these minimums does not make such conflict as to destroy the charter as to notice. So that beyond what we have said in paragraph two of this opinion, it should be further ruled that the charter provision (Sec. 34, Art. 18) as to notice was in force. As to the maximum time between the last publication and the day of election, the charter is silent and there would not necessarily be a conflict, although the election should have been held, and was held within said maximum. These views likewise determine this case.

IV.  It is suggested in a supplemental brief that even if the charter provision (Sec. 34, Art. 18 ) was not repealed by the provisions of new Sections 16 and 17 of the Constitution, it was repealed by the Act Act of 1921: of July 14th, 1921. [Laws 1921 (Extra Sess.) Emergency Clause.    pp. 110 and 111.] The trouble with this contention is that the notice in this case was begun before these laws became effective. They did not become effective until November 2nd, 1921. The notice began September 28th. [Laws 1921 (Extra Sess.) p. 201.]

It is true that there was a purported emergency clause to this Act of July 14th, 1921, but whether the acts falls within the "peace, health and safety" clause of

the Constitution has been declared a judicial question in
this State. The court, from the context of the act, deter-
mines whether or not *it falls* within the exception of the
constitutional provision. [State ex rel. v. Becker, 233
S. W. 641.]

This Act of July 14th, 1921, on its face merely re-
peals five sections of Chapter 72, Art. XVIII, of the Re-
vised Statutes of 1919, and enacted two new sections
in lieu of two of the five sections. The first new section
(Sec. 8854) authorized cities of 100,000, or more, to adopt
a new charter under new Sections 16 and 17 of the Con-
stitution as amended November 2nd, 1920. Such a law
does not cover such an emergency as is contemplated by
the exception as to the "peace, health and safety" as
found in Section 57 of Article IV of the Constitution.
The other new section (Sec. 8855) merely provides for
the required notice in such elections and comes no nearer
falling within the constitutional exception than does said
Section 8854, supra. The emergency clause to this act
does violence to the constitutional provision, and is void.
[See Becker's Case, supra.] With the emergency clause
void, the act could not become effective before the 2d
day of November, 1921, which was after the notice in this
case was first published. This law has no application to
the notice in the instant case.

All of the foregoing discussions come within the mo-
tion for judgment in this case, which motion is based
upon the admitted facts of the respondent's return or
answer.

V. Relator urges doubleness of propositions in said
Amendment No. 1. But before taking up that matter
there is another of importance. The ballot used we have
set forth in full in a prior portion of this
opinion. This ballot on its face does not
submit the names of the respondents as pro-
posed members of the Water Commission.
It speaks of repealing Article XI of the old

Ballots:
Omission from
Title: Legal
Fraud.

charter, and enacting two articles in lieu thereof, giving the number of sections in each, and then thus proceeds: "relating to the establishment of a Water Commission, prescribing the powers and duties thereof, and providing for a Water Works system, and to the establishment of a Board of Fire Commissioners, prescribing the powers and duties thereof, and for a fire department system." The quoted clause from the ballots purports to be. a summary of the contents of the said Amendment No. 1, yet not a word is there in this ballot to inform the voter that he was electing these men to office for more than statutory periods. It would only be by reference back to the amendment itself that the voter could find out that he was voting for men to fill office. Whilst notices of elections are published, yet many voters go to such special elections without further notice than that he has heard his neighbor say that there was an election. When such a voter so goes he looks at his ballot and determines whether he shall vote "yes" or "no" from the face of the ballot. In this particular case the voter would naturally rely upon the *resume* of the amendment, which we have quoted, supra, If he did, and no doubt hundreds of them did, they had no idea that they were voting respondents into high salaried offices. The ballot, in so far as the designation of respondents as officers is concerned, is so misleading as to amount to a legal fraud. It singularly enlightened the voter by summarizing the purported contents of the two new charter articles, in this language: "relating to the establishment of a Water Commission, prescribing the powers and duties thereof, and providing for a water works system, and to the establishment of a Board of Fire Commissioners, prescribing the powers and duties thereof, and providing for a fire department system." It more singularly failed to enlighten the voter, by omitting the fact that the established water commission was to be made up of the four respondents, and that the voters were not only creating four offices, but were actually filling the offces for un-

precedented terms, and providing for these offcers to name their own successors for a long period of time. It is not so much what the ballot failed to say which in- dicates the legal fraud couched within its terms, but more what it did say, when we consider therewith the omission which we have noted above. If the ballot undertook to give the substance and contents of the amendment it should have fairly given it in full, and should not have omitted the fact that the offices being created by the vote were likewise being filled by the same vote. Such ballot by reason of this omission was not only deceptive, but worked a fraud upon the voters. This alone should suf- fice to invalidate the election of respondents.

VI.   Close akin to fraud, at least legal fraud, is the question of doubleness of propositions to be voted upon by the electorate. This because the voter, in order to get what he earnestly wants, is compelled to vote for things which he does not want. It is a species of legal fraud to thus compel votes. It is a practice universally condemned. This question we discussed in our dissent in State ex rel. v. Gordon, 223 Mo. 1. c. 27 et seq., and this discussion was approved in State ex rel. v. Gordon, 268 Mo. 1. c. 338. This last case points clearly to the fraudulent character of such ballots, and reasons the question upon principles.

Double Proposition.

It has been suggested and urged in the briefs that the matter of doubleness only arises in cases where the incurring of debts, or matters of taxation, are concerned. It is true that the matter has usually arisen in such cases, and especially is this true in Missouri. But it does not follow that the question of doubleness of a proposition may not arise in other matters. On the contrary it has so arisen, and the doctrine is as firmly fixed in one class of cases as in the other.

In 9 Ruling Case Law sec. 76, p. 1059, it is well said: "Where questions are referred to the electors, whether

they are amendments to the constitution or questions of any other nature, they must be submitted separately so that each may stand or fall upon its own merits. But two questions cannot be treated together, to stand or fall upon a single vote. It needs no argument to show the injustice of such a submission. By it several interests may be combined; an unpopular measure may be tacked on to one that is popular and carried on the strength of the latter. A necessary matter may be made to carry with it some private speculation for the benefit of a few. Things odious and wrong in themselves may receive the popular approval because linked with propositions whose immediate consummation is deemed essential. It is against the very spirit of popular elections."

See also 20 Corpus Juris, p. 149, and 21 Am. & Eng. Ency. Law (2 Ed.) 47. The latter was cited from with approval in State ex rel. v. Allen, 186 Mo. 673. Further see Judiciary Amendments, or State ex rel. v. Powell, 77 Miss. 543, l. c. 571 et seq. This was a case involving an amendment to a state constitution, and it was held that there were many questions involved in the single amendment, upon which the people had a right to vote separately. There can be no question about the application of the rule to cases in general, and especially in cases involving amendments to an organic law. If the rule were otherwise two propositions might be submitted in a single amendment to an organic law, and the popularity of the one might force the adoption of the two by the vote.

In the single amendment before us in this case we have (1) the creation of a water commission, (2) the creation of a fire department, and (3) the naming of these respondents, to fill the offices of the water commission so created. The voter was compelled to vote for all three of these things or none. And this, too, in the face of the fact that under Section 35 of Article 3 of the existing charter (Charter of 1908, p. 169) the right to create offices, fix salaries and terms was given to the Common Council. This proposed charter amendment, in so far as

it selected officers of the city, by implication amended or repealed partially the foregoing section of the old charter, although the section or article is not named. But it suffices to say that the creation of an office, and the filling of an office, are two separate propositions, and if so this Amendment No. 1 was void for doubleness. As said by GANTT, J., in State ex rel. v. St. Louis, 216 Mo. l. c. 96: "But it is one thing to define an office and the duties appertaining thereto and provide for the filling of the same, and quite another thing under our Constitution for the Legislature to undertake itself to appoint officers." The creation of the office with its imposed duties and responsibilities is one thing, but the filling of the office with eligible and efficient officers is quite a distinct and separate matter. The amendment is double, if not more than double. Three vital propositions had to be determined by a single vote. It may be that the men named were of such prominence and outstanding character that the mere mention of their names in the amendment helped to carry it. If so, the weaker propositions were aided by the stronger one. This the law condemns in all cases upon doubleness of proposition. These men were neither elected nor appointed to office. There was no office until the amendment was successfully carried, therefore there was no office to be filled at this election. None of the formalities of an election to office were followed. No appointment of them was made for a like reason, and for the further reason that appointing to office is usually an executive function. But this latter is beside the case if there was doubleness of the proposition, and of this we feel certain.

Divers other questions are suggested in the briefs and on the record, but we shall not go further. The length of the term of office is charged to be in violation of the Constitution, and other matters are urged. We have gone even further than was necessary. No parallel case can be found in the books, but the reason of the law is against Amendment No. 1. No Missouri city ever undertook to do what was done here prior to this time.

Respondents should be ousted, and it is so ordered. *Woodson, C. J., Walker, Elder* and *James T. Blair, JJ.,* concur; *Higbee* and *David E. Blair, JJ.,* dissent, in an opinion by *David E. Blair, J.*

DAVID E. BLAIR, J. (dissenting).—The majority opinion refers to the rejection of an opinion previously written in this case. The opinion referred to was written by me and reached a conclusion different from that reached by my learned brother GRAVES and met the fate indicated. However, I remain unconvinced and feel that the duty rests upon me to state as briefly as possible the reasons for my dissent.

My learned brother, in his usual terse and vigorous style, has stated the facts more briefly than was done in the rejected opinion, but has covered them adequately for an understanding of the case, and I will not undertake to deal with the facts further than may become necessary to state my position.

I. The points discussed in paragraph one of the majority opinion were not raised in the briefs. I do not think their consideration necessary in order to determine the rights of defendants involved here. The rule is well settled that parts of an act (or a charter provision) may be vulnerable to attack and the remainder of the act may stand. The portions of the charter amendment criticised do not affect the creation of a separate water department or the rights of defendants to fill and discharge the duties of the office of commissioners of such department. It will be time enough to determine the various powers of the water commission when it seeks to exercise the powers of the office and such powers are challenged.

II. The first contention of informant and relator is that Amendment No. 1 (which included the repeal of

Article XI and the adoption of new Articles XI and XI-A) was not legally and regularly submitted in accordance with Section 16, Article IX, of the Constitution of Missouri, as it existed prior to November 2, 1920, under which the existing charter of Kansas City was passed and adopted, nor was such amendment submitted in accordance with the provisions and requirements of Section 34, Article XVIII, of the Charter of Kansas City, Said section of the charter of Kansas City is as follows:

Valid Submission of Charter Amendment.

"This charter may be amended at any time by a proposal therefor made by the law-making authorities of the city, published for at least thirty days in three newspapers of the largest circulation in the city, one of which shall be a newspaper printed in the German language, and accepted by three-fifths of the qualified voters of the city voting at a general or special election. The city may, by ordinance, subject to all laws, provide as to the form of submitting to such voters at any election any proposed amendment, and for ascertaining the results of the election on such proposed amendment, and making proper record of the fact."

So far as the provisions for publication of notice are concerned, the provisions of said section of the charter are in almost the exact language of old Section 16, Article IX, of the Constitution. The only provisions in either old Sections 16 and 17, or new Sections 16 and 17, for publication of notice of election for adopting either an entirely new charter or amendments to an existing charter, are contained in old Section 16 and new Section 16. Old Section 16 made no provision whatever regarding the publication of notice of election for the adoption of an entirely new charter, but provided that when a charter was once adopted it could be amended by a proposal from the law-making authorities published for at least thirty days in three newspapers of largest circulation of said city, one of which shall be a newspaper printed in the German language, and acceptance by three-fifths of

the qualified electors voting at a general or special election. Said Section 16 dealth both with the adoption of a charter as a whole and with amendments to an existing charter. New Section 16 deals exclusively with the submission of a new charter and new Section 17 with amendments to an existing charter. It is only in new Section 16 that any provision for notice of any election is now found. It is insisted that this provision applies only to the election to vote upon an entirely new charter, or amendments submitted to the electors by a charter commission as provided for in new Section 17. Said new Section 17 also provides for the submission of amendments to the charter proposed by the legislative authority or by petition of not less then ten per cent of the qualified voters of the city. Only proposals by the law-making authorities were provided for in old Section 16. It was upon the petitions of electors that the legislative authority submitted the charter amendment in question.

It is the contention of informant and relator that the provision for publication of notice of elections in new Section 16 does not apply to amendments proposed by petition or by legislative authority, and that as to such amendments the provisions of Section 34, Article XVIII, of the charter stand unrepealed; that the charter amendment here under consideration, having been published in only one newspaper for three weeks, was therefore not legally adopted.

It will be noticed that Section 34, Article XVIII, of the charter makes no provision whatever for amendment of the charter upon proposal by petition of the qualified voters of the city, and therefore no provision for publication of notice of election upon a proposal so submitted. The reason for this is that old Section 16, Article IX, of the Constitution made no provision for such proposal. New Section 17 provides for both, as well as proposals by a charter commission, but makes a clear distinction between them. Proposals by petition were not included in the words in Section 34, Article XVIII, of the

charter "by a proposal therefor made by the law-making authorities of the city," for the obvious reason that the qualified voters were not authorized thus to petition when that section of the charter was adopted. The words refer to the submission of a *proposal* originated by the legislative authority, and not to the ordinance provided for in new Section 17, Article IX, of the Constitution submitting proposals originated by petition. In the absence of direction in the charter concerning the manner of giving notice of election to vote upon charter amendments thus proposed by the qualified voters, it is apparent that the legislative authority of the city had the right to provide any sort of notice it deemed sufficient if such notice was calculated to and did give reasonable notice to the voters. The legislative authority required the giving of the very notice specified in new Section 16, Article IX, of the Constitution as to framing new charters, and such notice must therefore be regarded as sufficient and reasonable, because it meets the constitutional standard.

The intent of the people in adopting Sections 16 and 17, Article IX, of the Constitution, evidently was to do away with the cumbersome and expensive method of giving notice of elections upon proposed charter amendments provided for in old Section 16. In old Section 16 the provision for publication of notice for thirty days in three newspapers of largest circulation, one of which shall be a newspaper printed in the German language, was only applicable to *amendments* of the charter. No specific direction was therein contained covering publication of notice of elections to decide upon the adoption or rejection of *a complete charter*. It is hardly conceivable that the Legislature in submitting the proposed constitutional amendment and the people in adopting it intended completely to reverse the requirements and provide *only* for publication of notice of election on complete charters.

New Section 17 of the Constitution of Missouri au-

thorizes the legislative authorities of the city to provide by ordinance that any proposed amendment shall be submitted at a general election or at a special election, if called for in the designated manner. Publication of notice of the proposed amendment to Article XI of the charter, as actually provided for by the legislative authorities of Kansas City, was in full compliance with the provisions of new Section 16, Article IX, of the Constitution of Missouri, and such publication should be deemed to be sufficient.

It, therefore, becomes unnecessary to determine the effect of other publications of notice as set out in defendants' amendment to their answer or the effect of the construction placed on Section 34, Article XVIII, of the charter by the city officials, as shown by the Stewart affidavit.

The distinction sought to be drawn in the majority opinion between charters adopted before and after the adoption of new Sections 16 and 17 of the Constitution does not appeal to me as sound. The position taken, drawn to its legitimate conclusion, would deny to cities organized under special charter on November 2, 1920, the right to *amend* such charters at all, because old Section 16, authorizing such amendments, was repealed and the right of amendment would exist only as to charters adopted since November 2, 1920. The charter provision of Kansas City relating to amendments must fall with the repeal of old Section 16 of the Constitution which furnished the authority for that charter provision. The only way remaining to change the charter in any way would be to adopt a charter as a whole. This is the logical conclusion that must be reached. I cannot concur in any such proposition.

III. It is contended that the ordinance submitted and the ballot contained two or more separate, distinct and independent propositions or measures as a single Doubleness.   proposition in Amendment No. 1, thereby compelling the voter to accept or reject all, **and therefore such amendment to the charter was not**

legally adopted because afflicted with the vice of double-ness.

The restrictions upon the power of govermental bodies forbidding the submission of two or more questions or propositions in one ballot are not found in constitutional or statutory provisions, but such practice is denounced by the courts as a fraud upon the voters. Such procedure enables municipal authorities to tie up a proposition, unable to stand on its intrinsic merit, with one for which there is great public demand, and, by thus tying them together, compel the voters to accept or reject both, or by a series of logrolling and trading insure support for the united propositions which would be denied each or some of them individually, if submitted separately. The Missouri cases relied upon by informant and relator are cases wherein independent proposals for the issuance of bonds were submitted and voted for in one ballot. The majority opinion does not so confine the rule, and sound public policy may extend the rule to other propositions. On the other hand, sound public policy required that the proposition to repeal Article XI of the Kansas City Charter be linked inseparably with an enactment making provision for the immeasureably important water supply and fire protection of an already great and rapidly growing city. Disaster might follow repeal of Article XI without making provision for lodging the powers therein provided for in some other department or departments of the government. Suppose Article XI of the charter had been repealed and new Article XI had carried and Article XI-A had been defeated at the election on them separately. The city would have been without provision for a fire department. The very reasons which argue *against* doubleness in submitting proposals under the taxing power, argue *for* the submission of the question of the lodgment of control of the water department and the fire deparment in one proposition and on one ballot. To submit them separately would surely invite public disaster. The several

propositions are not only not independent, but completely dependent on one another. The provision naming defendants as the first water commissioners was also a dependent proposition, although it need not necessarily have been included. I think there is no merit in the contention.

IV. Another contention of informant and relator, not discussed in the majority opinion and not required to be discussed therein, because of the conclusion reached, is that the provision in Article XI of Amendment No. 1 of the charter, that defendants should constitute the first water commissioners, violates Section 14 of Article IX of the Constitution of this State, because defendants were neither elected nor appointed. Said section is as follows:

*Appointments: By Charter Amendments.*

"*Except as otherwise directed by this Constitution,* the General Assembly shall provide for the election or appointment of such *other* county, township and municipal officers as public convenience may require; and their terms of office and duties shall be prescribed by law; but no term of office shall exceed four years." (Italics ours).

What do the words "except as otherwise directed by this Constitution" mean? They do not refer to the officers named by the Constitution itself, because the use of the word "other" shows conclusively that the officers for which the General Assembly shall provide are in addition to those named in the Constitution.

It seems clear that the scheme of government and schedule of officers, which cities of over 100,000 population could and now can adopt under the provisions of old and new Sections 16 and 17 of Article IX, come within the "except as otherwise directed" clause of Section 14, Article IX. The General Assembly is not required to make provision for officers of cities under special charters, because they may adopt such sort of government

for themselves and such officers to administer the same as they choose. The only restriction upon such cities is that the provisions of their charters shall be "in harmony with" (old Section 16) or "consistent with" (new Section 16) and subject to the Constitution and laws of this State. Even the requirement in old Section 17, Article IX, that "it shall be a feature of all such charters that they shall provide, among other things, for a mayor or chief magistrate, and two houses of legislation, one of which at least shall be elected by general ticket," was omitted in new Sections 16 and 17.

Kansas City has adopted its charter under said Section 16 and provided therein for a mayor as its chief executive officer and vested in him "power to appoint, in the manner provided in this Charter, all city officers, agents and employees not elected by the people *or otherwise appointed.*" (Italics ours.) Under the reservation "or otherwise appointed" it was and is entirely competent for the people of Kansas City to provide for appointment to office by an officer or department of the city government other than the mayor. Why, then, was it not proper for the people to adopt a charter amendment providing for the creation of an office and designating the official by name? We are not referred to any constitutional provision or act of the General Assembly with which such charter amendment is in conflict. Section 14 of Article IX of the Constitution is in part a command to the General Assembly, and in part a restriction upon it. It is not a restriction upon the freedom of action of cities organized under special charter.

The word "appointment" is not restricted to the act of the executive in designating a person to fill an office. It is defined in Webtster's New International Dictionary, "1. Act of appointing," that is, the act of assigning or designating. "e. Designation of a person to hold an office or discharge a trust." True, the same dictionary uses as an illustration "a power of *appointment* to office is an executive power and involves the right to

exercise judgment or discretion in the selection of the person appointed.'' But the executive is the appointing power, because so designated in the Constitution or charter. Section 11, Article V, Missouri Constitution, provides that the Governor shall appoint persons to fill vacancies. But the Constitution has provided for at least one exception in Section 11, Article IX, by directing that vacancies in the offices of sheriff and coroner shall be filled by the county court.

So it is under the charter of Kansas City. Where the office is not elective and the officer or agent is not ''otherwise appointed,'' the power of appointment is vested in the mayor. But where the charter amendment named the first water commissioners, such officers were ''otherwise appointed.'' The designation of these officers by name in the amendment may be said to be an appointment in the sense of the words ''otherwise appointed'' in the charter, and this is so, although such words include as well appointments to be made by other designated offcials. Naming the water commissioners in the amendment comes within the definition of ''appointment'' given above, to-wit, designation of a person to hold office.

Informant and relator rely on the cases of State ex. rel. Board of Control v. City of St. Louis, 216 Mo. 47, 1. c. 95, and State ex inf. Hadley v. Washburn, 167 Mo. 680, 1. c. 691. But these cases deal with Section 14, Article IX, as a restriction upon the power and duty of the General Assembly in creating county, township and municipal offices other than those established by the Constitution. The acts of the General Assembly are there held to be within the provisions of said section. Provisions for creating city offices and determining how they shall be filled, in cities operating under a special charter, must be held to be within the exception noted in said Section 14, Article IX. The cases are therefore not in point.

It is true the names of defendants as the first water commissioners were not printed on the ballot; neither

were many other of the propositions in the proposed new article of the charter covered by Amendment No. 1. The proposal was published in full, and the voters had the required notice of the contents of the proposal. It was not necessary to print the amendment in full on the ballot. I think there is no merit in the contention.

V.  It is next contended that the provisions of Article XI in Amendment No. 1 of said charter fixing the terms of the offices filled by defendants at a longer period than four years also violates Section 14, Article IX, of the Constitution.  What I have said under Paragraph IV applies equally to this contention.  It was competent for Kansas City to provide in its charter for any sort of government for itself it saw fit, limited only by the provision that such charter be consistent with and subject to the Constitution and laws of the State.  The General Assembly has not undertaken to legislate on the subject of water commissioners or other officers of cities under special charter or to prescribe their duties or fix their terms of office.  The provisions of Section 14, Article IX, limiting the terms of officers to four years, refer only to offices created by the General Assembly.  The creation of the various offices of Kansas City and the prescribing of the duties thereof and the fixing of the respective terms come within the exception contained in the first clause of said section.  The contention is without merit.

*Terms in Excess of Four Years.*

VI.  The final contention is that the provision of new Article XI of the charter designating defendants as water commissioners by name is special legislation and violative of Section 53, Article IV of the Constitution.

*Special Legislation: Charter Amendments.*

Assuming that the amendment to the charter is of such character as to be denounced as special legislation if enacted by the General Assembly, I am persuaded there is nothing in Section 53, Article IV, denying the

right of the electors of Kansas City to enact such provisions in their *charter* any more than there is anywhere any prohibition upon the people of the whole State preventing them from adopting a *constitutional* amendment of such character.  Section 53, Article IV, withholds from the General Assembly the right to pass local or special laws.  The Constitution nowhere so restricts the powers of electors of cities over 100,000 inhabitants in framing or amending their charters.  It may be that if the General Assembly passed a similar law, it would conflict with said constitutional restriction.  This does not mean, however, that the people of Kansas City are above the General Assembly.  It does mean that neither the Constitution nor the General Assembly has attempted to prevent the people from writing such provisions into their charters, and, therefore, such charter provision is not inconsistent with either the Constitution or laws of the State.  That charter provisions shall be consistent with and subject to the Constitution and laws of the State, is the pole star by which electors must guide and shape their course in framing their charters.  Unless shown to be in such inconsistency, it is not the province of the courts to declare void charter provisions of whatsoever character.

Cases are cited by relator which appear on casual examination to conflict with the foregoing.  For instance, Hays v. Poplar Bluff, 263 Mo. 516, in a case where an ordinance passed by the council of that city was held invalid as special legislation.  The ordinance was sought to be justified by a provision in the general law relating to cities of the third class.  It was held that the General Assembly itself could not pass such a law, and that it was beyond the power of that body to confer power to pass such ordinances upon the city council.  The city in question only had such powers as the General Assembly expressly delegated to it.  Not so in the case of a city under special charter.

So in Ex parte Lerner, 218 S. W. (Mo.) 331, an

ordinance enacted by the *legislative* authority of St. Louis, a city under special charter, was held invalid as a special or local law.

Also, in St. Louis v. Quarry & Construction Co., 244 Mo. 79, an *ordinance* making it unlawful to work a stone quarry within the city without having obtained the permission of the city by a proper ordinance was held invalid as a local or special law. And in St. Louis v. Russell, 116 Mo. 248, an *ordinance* authorizing lot owners in any block to determine whether a livery stable could be operated in said block was held invalid because legislative power was attempted to be delegated by the mayor and municipal assembly and because it permitted discrimination.

Other cases of similar character can doubtless be found. But we think there is a difference between *ordinances* enacted by the *legislative authorities* of a city, whether such city is organized under general law or special charter, and charter provisions formally and solemnly ordained by the *electors* of such city in their sovereign capacity and acting as principals and not as *legislative agents*. This distinction seems to have been recognized in St. Louis v. Quarry & Construction Co., supra, wherein, BROWN, C., at page 488, said:

"These provisions of the Constitution of 1875" (referring to Sec. 53, Art. IV) "are founded in the conviction that personal and property rights of the citizen have need of protection against the arbitrary and irresponsible exercise of the *legislative power*—arbitrary because the motive of the Legislature cannot, in the absence of some constitutional restriction, be questioned, and irresponsible because legislators are not responsible in damages for injuries suffered by reason of their legislative acts. It is illogical to suppose that, in matters affecting the security of the citizen with respect to his person and property, the municipal corporation, in its *legislative capacity,* should not be subject to the same restrictions as the Legislature from which, it derives its powers.

This question also presented itself to the people in their capacity of makers of the organic law, so that in authorizing the charter which we are now considering, they provided, as we have already seen, that it 'shall be in harmony with and subject to the Constitution and laws of the State.' The Constitution is largely devoted to the restriction of the *legislative* power in the granting of special privileges, and in the enactment of special and arbitrary legislation affecting the rights of the people, and we cannot harmonize with these restrictions an unlimited power to grant special privileges, and *by special legislative act* to discriminate between individuals of a municipality with respect to the use of their property and the conduct of their business." (Italics ours).

The provisions of Section 53, Article IV, are not leveled against legislative power generally, but against the exercise by the General Assembly of its legislative power within the prohibited field. The electors of cities over 100,000 population, in the adoption of amendments to their charters, are not hampered by such restrictions. For the mayor and council of cities under special charter to enact ordinances amounting to special legislation would not be consistent with such constitutional restrictions upon the General Assembly, but such constitutional restriction has not been imposed either against the people of the State or of such cities in framing constitutions or charters or amendments thereto. Within their appropriate sphere and limited only by the Constitution and laws of the State, the people of Kansas City are the final and supreme authority in determining the character of their local government, the manner in which their ordinances shall be enacted, the designation of their officials and the methods by which they shall be selected.

For the reasons above outlined, I respectfully, but earnestly, dissent. *Higbee, J.,* concurs herein.