Ex PARTE BYRON MARSH, Petitioner, v. HARRISON BARTLETT, Sheriff of Dallas County.—121 S. W. (2d) 737.

Court en Banc, December 3, 1938.

528

*Charles M. Polk, Wm. R. Collinson* and *Lon S. Haymes* for petitioner.

*Roy McKittrick,* Attorney General, *Wm. Orr Sawyers* and *Olliver W. Nolen,* Assistant Attorneys General, for respondent; *Lawrence L. Bradley* of counsel.

532

*Wm. F. Fahey, J. T. Montgomery, R. A. Brown, Jr., Nick T. Cave, Curtis J. Quimby, Ludwick Graves, Russell Dearmont* and *L. D. Joslyn amici curiae.*

HAYS, J.—Original proceeding in *habeas corpus* instituted by the petitioner to secure release from the custody of respondent, Har-

rison Bartlett, sheriff of Dallas County. The issue is framed by respondent's return to said petition (by stipulation taken as and for our writ), the petitioner's answer to said return, and respondent's motion for judgment on the pleadings. No questions of fact are in dispute. The facts follow:

Petitioner was arrested on May 28, 1938, upon a warrant issued by a justice of the peace for Benton township in said county, charging the petitioner with catching a large-mouth bass in said township on said date and during the closed season for bass as fixed by Section 8270, Revised Statutes 1929. Upon that charge, duly laid, the petitioner was convicted, was adjudged and sentenced to pay a fine of $10 and the costs, and upon his refusal to pay same was committed to respondent to be held in jail until discharged by law.

Said Section 8270 fixes a closed season for game fish in Missouri covering the period between April 1 and May 30 of each year and, *if in force*, prohibited the catching of bass on May 28, 1938. It made petitioner's act in so doing a misdemeanor, and his conviction will under that statute justify the respondent in holding him under the warrant. Respondent's said return, prepared by the Attorney General and Assistant Attorneys General, sets up in justification that said statute was then in force.

The petitioner's answer prepared by petitioner's learned counsel sets up that said section of the statute was repealed by Constitutional Amendment No. 4 and was supplanted by a certain regulation, hereinafter referred to, prior to the date of petitioner's charged offense. This amendment, as initiated by the people and thereafter on November 3, 1936, adopted (Laws 1937, pp. 614, 615), created a Conservation Commission, the members of which were to be appointed by the Governor, and further provided, among other things, that "the control, management, restoration, conservation and regulation of the bird, fish, game, forestry and all wild life resources of the State . . . shall be vested" in said commission and further provided that "all existing laws inconsistent herewith shall no longer remain in force and effect. This amendment shall be self-enforcing and go into effect July 1, 1937."

The commission having thus been created and empowered and the members thereof appointed by the Governor, adopted and promulgated on April 11, 1938, regulations establishing a closed season for bass and other game fish during the period between April 1 and May 28, for the year 1938, which were in effect from and after April 11 pursuant to promulgation and notice given in a manner detailed in said answer.

So that, the ultimate question proposed for decision is, Which applied and governed in the premises—the enacted statute mentioned, or the regulation established and promulgated by the commission?

All the counsel—including divers able lawyers from various localities in the State, appearing by leave of court as counsel for *amicus curiae,* an organization known as the Conservation Confederation of Missouri—join in representing to us that our decision of this case will essentially involve a far-reaching interpretation of organic law and affect a grave public interest at least state-wide. Thus apprised of the great importance of this proceeding, we are mindful as well of our judicial duty, of the same degree of importance, to confine the scope of our judicial considerations within the limits of the essential controversial features of the case and the law applicable to their determination.

Further by way of introduction, it is to be noted that there is no controversy in respect of the initiative proposal and adoption of Amendment No. 4. Under the pleadings as framed it is admitted by respondent, and in his supplemental brief expressly conceded, that everything essential under the law to accomplish the adoption of a constitutional amendment was performed. Accordingly, our attention may now be directed to the controversial features of the case.

It is respondent's position, in substance, that the questioned amendment thus adopted, when tested by the touchstone of the Constitution itself, is lacking in the essentials of a valid constitutional amendment; is not, in effect, organic law but a legislative act unrelated to and incongruous with the Constitution which creates a three-fold division and separation of governmental powers, a form of constitutional government common to most if not all of the States of the Union.

Among the specific deficiencies advanced are these: (1) The absence of a section number—section 1, for example, is suggested—to identify the initiative instrument; (2) the absence of some expression in the instrument identifying the number of the particular article or section in the Constitution to which the amending instrument relates or which it will affect. The presence of such omitted matter, it is contended, was a precedent essential in order that the instrument might become a new article or new section within the purview of Section 2 of Article XV of the Constitution; and, that the absence of any such requisites renders the instrument a mere legislative act. Said Section 2 provides, in part:

"No proposed amendment shall contain more than one amended and revised article . . . or one added new article which shall not contain more than one subject and matters properly connected therewith. . . ."

Regarding the proposition contained in the foregoing contentions we are unable to see that said quoted section is applicable to any of them. Evidently it has no relation to numbering a new section

or article. We know of no provision of the Constitution pertaining to that subject other than Section 4 of the Schedule. All specific requirements of such a nature pertain to legislative acts solely and are found in the Revised Statutes of 1929, Article IV, Sections 24 to 34, inclusive.

A brief reference to the Sessions Acts will disclose a number of previous constitutional amendments—some proposed, others adopted —that are marked by the same alleged deficiencies as No. 4 in the respects now under consideration: Laws of 1909, page 906 (initiative and referendum); id. page 910 (proposing new State Capitol); Laws of 1911, page 450 (authorizing bonds for same); id. page 451 (registration of voters); Laws of 1921, pages 694 and 699 (enabling women to hold office); Extra Session 1921, page 195 (same adopted by initiative).

Again, numbering the amendment by section, it being but "one new section," would have been meaningless and redundant as the instrument is a homogeneous whole. Further, the whole duty relative to the matter of numbering and of relating the amendment to the Constitution according to its subject matter is by the Schedule (Sec. 4, Sched. Mo. Const, Vol. 1, p. 161, R. S. 1929) committed to the Secretary of State as a matter of administrative discretion.

In support of the contentions above discussed, and also regarding legislative character of the amendment and its consequent lack of harmony with the Constitution, the Attorney General cites and relies in the main on State ex rel. Stokes v. Roach (Mo.), 190 S. W. 277, and State ex rel. Halliburton v. Roach, 230 Mo. 408, 130 S. W. 689. Those cases dealt with initiative petitions and their sufficiency.

In the Halliburton case the question was whether the initiative petition which was there under review, proposing an amendment to change the method for dividing the State into senatorial districts, was valid. That case, respondent points out, is cited for an argumentative purpose. However, we observe that the proposed constitutional amendment there in judgment was similar to Amendment No. 4 in most of the features thus far treated herein and in others to follow.

The gist of the majority holding therein was that the proposed amendment was not valid, because in effect it was not organic law but a temporary legislative act, and should not be submitted under the false cognomen of an amendment. The Halliburton decision was disapproved by a majority opinion in the Stokes case, supra, GRAVES, J., dissenting in a separate opinion filed. Upon that dissenting opinion (see 190 S. W. 281, 287, inc.), the Attorney General for the most part bases his said contentions and so states in his argument made thereon and in his brief quotes some half-dozen pages therefrom.

Space does not permit nor does the determination of the case require that we follow into the details of the argument and our further discussion, it is hoped, will comprehend and adequately treat of the propositions advanced in the arguments of the various counsel.

Continuing, but here on the topic alone of legislative character. The Attorney General likens this amendment to the Fish and Game Code (Chap. 43, pp. 2329-2352, R. S. 1929), and he quotes Section 8209 which imposes upon the Fish and Game Commissioner the duty to enforce all laws now or hereafter enacted for the protection, preservation and propagation of the game animals, etc.; and also Section 8218 which authorizes and empowers that official to assume the control and management of all the state fish hatcheries. All of the details of control and management conferred upon him are filled in by the statutes supra. It is argued therefrom that he was clothed with delegated legislative power and that the Conservation Commission possesses the like. On the other hand, in addition to the matter we have earlier quoted from the Amendment, it "vested" the Conservation Commission with "the administration of the laws . . . pertaining thereto" (conservation, etc., numerated) and with "the power to acquire by purchase, gift, eminent domain, or otherwise, all property necessary, useful or convenient for the use of the Commission, or the exercise of any of its powers hereunder." Thus the details were not filled in but were left to the administrative discretion of the Conservation Commission.

As regards the administrative authority conferred by the Game Code and that conferred by the Amendment, there is a similarity. But the power so conferred being administrative and not legislative, is not an unconstitutional delegation. [United States v. Grimaud, 220 U. S. 506.] Legislative power cannot ordinarily be delegated, but administrative rules do not become legislative because violations thereof are punished as public offenses. (Id., citing Field v. Clark, 143 U. S. 692.) So, it follows that our immediate question is upon the remainder of the Amendment or rather upon the broad policy it declares regarding the subject matter of the Amendment, namely, "The control, management, restoration, conservation and regulation of the bird, fish, game, forestry and all wild life resources of the State. . . ." This policy-creating portion which determines the object to be accomplished is necessarily within the attack made on the Amendment as a whole, that it is legislative in character and, by reason thereof, violates Section 1 of Article IV of the Constitution. The respondent cites and relies on that section as expressly assuring that "the legislative power, subject to the limitations herein contained shall be vested in the . . . General Assembly. . . ." The limitations contained in that original instrument included the subjects contained in Articles IV, X and XI and the reservations in

Article II of the Bill of Rights, and. certain others expressed or implied but needless to be stated here.

This contention overlooks the change resulting from the adoption, in 1908, of the initiative and referendum amendment, Section 57, Article IV of the Constitution. As regards that amendment this court has held, that the people in adopting it did not intend merely to confer the grant contained in said section 1; it served the one purpose, to recall all legislative power theretofore granted to the end that the whole power to be granted should be subject to the initiative and referendum. [State ex rel. Gordon v. Becker, 329 Mo. 1053, 49 S. W. (2d) 146.] We therefore hold (1) that the authority was delegated by the people to the General Assembly to legislate by enactment, subject to the referendum clause, and to propose constitutional amendments by enactment of joint and concurrent resolutions; (2) that initiative authority in the people was reserved thus: Vesting the legislative authority of the State in the General Assembly, "the people reserve to themselves power to propose laws and amendments to the Constitution and to enact or reject the same at the polls, independently of the legislative assembly. . . ."

■ We have not been directed to any provision of the Constitution which expressly or impliedly limits the content of an amendment thereto, save the one which relates to singleness of subject matter: and is quoted herein above, Section 2 of Article XV. With respect to respondent's insistence that said section is violated, it is readily apparent on the face of the Amendment that it relates to a single object; and the subjects embraced therein, if several, are germane to the general subject of the Amendment. Hence, in this regard as well as in other respects discussed above, the Amendment does not infringe on the Constitution as it speaks to-day. [State ex rel. State Highway Commission v. Thompson, 323 Mo. 742, 750, 19 S. W. (2d) 642.] And we think it is in harmony, in its nature and its attributes considered in this opinion, with the remainder of the Constitution, even though the former in its entirety is legislative in its nature. It is interesting to note that the criticisms here considered, as regards incompatibility and legislative nature of the Amendment were, in the National Prohibition Cases, 253 U. S. 350, leveled against the Prohibition Amendment—of pleasant or unpleasant memory according as the individual reaction may be—and were therein disallowed. However; these conclusions will remain tentative until buttressed by further exposition of principles and until after the disposal of an intermediate contention of respondent.

■ That contention is that the Amendment is invalid by reason of insufficient terms employed therein to identify it as an amendment, and consequently the voters may have been misled into think-

ing they were voting to enact an initiative statute. This requires a statement of the terms actually employed therein as identifying or classifying it.

Let us take the Amendment as it appeared on the ballot, with a title prepared by the Attorney General. It may be assumed under the admissions contained in the record, that that official performed his duty in the premises by affixing a title indicating that by the proposal it was sought to *amend* the Constitution. And the concluding part of the proposal contained the following: "The General Assembly may enact any *laws* in aid of but not inconsistent with the provisions of *this amendment* and all existing *laws* inconsistent herewith shall no longer remain in force or effect. *This amendment* shall be *self-enforcing* and go into effect July 1, 1937." (Our italics.)

How could such language import that a statute was being enacted inconsistent with which no statute could subsequently be enacted? Is it to be assumed that the people were ignorant of the difference between the enactment of a law, or statute, and the adoption of an amendment to the Constitution? If so, of what value is thirty years' experience of the people in discriminatingly adopting constitutional amendments and enacting statutes by the initiative method? According to the argument on behalf of respondent the precisive choice shown in the appropriate use of "amendment" and of the word "laws" where used, was beyond the notice and mental perception of the voters. We are not so persuaded. It is our conclusion that the terms laws and amendment were used in their plain and ordinary sense, and that Amendment No. 4 is not ambiguous but fairly and sufficiently clear.

The reference already made to the power the people reserved to themselves in Section 57 of Article IV with the express right to exercise the same without let or hindrance of the General Assembly, will be recalled to mind. This power, a political one, and the exercise of its functions is of the essence of sovereignty which resides in the people. In the Bill of Rights (Sec. 1, Art. II) as found in the Constitution it is declared "That all political power is vested in and derived from the people; that all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole." In view of these reservations of sovereignty and of the right to exercise functions thereof in the State's government, it seems self-evident that the exercise thereof in this particular instance to provide in the mode selected and to the extent effected by an *enduring* ordinance, policy-forming as to its subject matter and rule-delegating as regards the administrative functions and imposed duties, was valid notwithstanding the general field for action by way of statutory enactments had theretofore been entered solely by successive Legislatures. That condition, long exist-

ing, continued merely because until of late the people did not attempt to exercise their stated reserved authority.

But the present attempt to exercise it does not deprive the legislative department of the government of *its* power or functions but relates to only a small portion of the power reserved to the people, the exercise of which suspends and supersedes the power of the Legislature as to that portion alone which involves the subject matter and its governance as provided in said Amendment. More than that, neither the submission nor the adoption of the Amendment was the exercise of a legislative function; it was an organic function, organically exercised; the General Assembly is without constitutional power to propose an amendment by the initiative process.

The fundamental political power referred to above includes, of course, the all-important police power. This latter power finds direct application to the general welfare, which includes the object of the Amendment. It is so applied by the Supreme Court of the United States in Geer v. Connecticut, 161 U. S. 519, wherein it was held that, a state, in the exercise of its police power, could regulate and control game and fish within the State, not for its own use as proprietor, but as a representative of the people in their united sovereignty.

The sovereign people having enlisted the Conservation Commission as the constitutional agency to exercise the powers and functions granted in Amendment No. 4, it is not our function to consider or to determine the wisdom, the expediency or the policy to be executed by that body. But we are properly concerned with the questioned validity of the Amendment. For the reasons announced we find the validity to be absolute.

Further, and in reference to the operative effect of the Amendment, and its contained declaration that it is self-enforcing. It seems clear that there is no incongruity in the situation created by it through a rightful and permanent entry into the legislative field, as in the present instance, for the attainment of the Amendment's objective with the harmonious and invited co-operation of the Legislature, so far as may be necessary or helpful, by the latter's future enactment of laws relating to that objective. No doubt should be entertained of the willingness of that body to co-operate with the Conservation Commission in the manner just stated. And the former will doubtless need no reminder that, apart from the Amendment, the Constitution lays upon that body a duty to at least "pass all such laws as may be necessary to carry all amendments of the Constitution into effect." [Const. Sched., Sec. 5, R. S. 1929, p. 161.]

As an illustration of interplay of powers such as those referred to above: It has been held, that interstate commerce in its practical conduct has many incidents having varying degrees of connection

with it and effect upon it over which the State may have some power. [Southern Railroad Co. v. Reid, 222 U. S. 424, 434, 32 Sup. Ct. 140, 56 L. Ed. 257.]

There can be no question but that the Amendment in express terms repealed all existing laws inconsistent therewith. We think the question here is whether there remain sufficient existing laws *not* inconsistent therewith. And the correct answer is determinative of self-enforcement. The answer is yes, conditioned upon whether there still exist fixed penalties estabished by statute and now applicable to violations of rules and regulations established by the Conservation Commission. It has been held that such a provision for such additional legislation as may "aid" the operation of the constitutional amendment does not hold it in abeyance until such legislation is enacted, the word "aid" signifying to support, help or assist. [State ex rel. Clark v. Harris, 74 Ore. 573, 144 Pac. 109; see 12 Cyc., sec. 106.]

It has been indicated above that the Conservation Commission has been granted the authority to control, regulate, etc., the matters committed to it. There was much discussion by counsel in their oral arguments, and much appears in their brief, with reference to the meaning of the words definitive of that authority. In the aspect of the Amendment now under consideration there is no need to go into definition of the various terms. They take color and significance from the context.

The term "regulate" will be sufficient for the moment. It includes ordinarily the means to adjust, order, or govern by rule or established mode; direct or manage according to certain standards or rules. [Sluder v. St. Louis Transit Co., 189 Mo. 107, 88 S. W. 648, 5 L. R. A. (N. S.) 186.] Regulation and legislation are not synonymous terms. [In re N. W. Indiana Tel. Co., 201 Ind. 667, 171 N. E. 65, 70.] Regulation is comprehensive enough to cover the exercise of authority over the whole subject to be regulated. [Southern Railroad Co. v. Russell, 133 Va. 292, 112 S. E. 700, 703.]

It will be remembered that in the body of the Amendment the word "laws" occurs twice and is therein definitely related to the Legislature or to the legislative power, while the word "regulate" and kindred words are attributed to the administrative power and duty. Also, as pointed out in our citation of the Grimaud case, supra, punitive laws or laws fixing punishment as for violations of administrative rules are solely referable to the legislative power and function, and, on the other hand, administrative rules may have the force of law in that violations thereof are punishable as public offenses. Hence it follows that unless there be existing statutes that are not inconsistent with the Amendment but which do in effect fix punishment for acts or conduct that may fairly come within the pur-

view of some rule or rules established by the Conservation Commission, it cannot be said that the Amendment is completely self-enforcing; if the situation be the opposite, our conclusion will be the opposite.

With statutes inconsistent with Amendment No. 4 we have nothing to do. Such as were inconsistent, including said Section 8270, were expressly repealed by that instrument. Repeal in that manner is all-sufficient, for a statute may be nullified, insofar as future operation is concerned, by a constitution or a constitutional amendment as well as by statute; and the constitution or the amendment, as the highest and most recent expression of the law-making power, operates to repeal, not only all statutes that are expressly enumerated as repealed but also all that are inconsistent with the full operation of its provisions. [12 C. J., sec. 97, pp. 725-726.] A provision may be so framed, however, that, while legislation is necessary to put into effect its affirmative principles, it repeals existing statutes inconsistent with it. [Id., pp. 727-728, sec. 4.]

The Game and Fish Code, to which reference has been made, comprises more than one hundred sections. It is probable that among them, sections may be found here and there which were not inconsistent and not so repealed, and doubtless other sections that, with slight change, might readily be re-enacted. But that is not of present concern. However, on casual examination we find a penalty section that obviously has not been repealed. It is Section 8311, Revised Statutes 1929, reading as follows:

"Any person violating any of the acts prohibited by the fish and game laws of the State of Missouri, a penalty for which is not otherwise specifically provided, shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished in the same manner as provided for other acts of misdemeanor under the laws of this state."

It therefore follows that penalizing and general Section 8311 appropriately operates upon all violations of reasonable rules and regulations established by the Conservation Commission concerning the matters committed to it by said Amendment No. 4. The regulation under consideration here is apparently a reasonable one, and was in force and controlling on May the twenty-eighth last and the provisions thereof in effect. It is also obvious the Amendment is self-enforcing.

From the foregoing considerations it inevitably follows that the petitioner was unlawfully convicted and is wrongfully being deprived of his liberty by the respondent-sheriff. The petitioner is discharged. All concur, except *Leedy, J.*, not sitting.