STATE ex rel. BOARD OF FUND COMMIS-
SIONERS of the State of Missouri, and
Phil M. Donnelly, John M. Dalton, George
Hubert Bates, and M. E. Morris, constitut-
ing a majority of the members thereof,
Relators,

v.

Haskell HOLMAN, State Auditor of
Missouri, Respondent.

No. 45678.

Supreme Court of Missouri.

En Banc.

Dec. 10, 1956.

John M. Dalton, Atty. Gen., Robert R. Welborn, Asst. Atty. Gen., for relators.

Frank B. Edwards, Jackson A. Wright, Fry, Edwards & Wright, Mexico, for respondent.

Thompson, Mitchell, Thompson & Douglas, James M. Douglas, Richard P. Conerly, St. Louis, for Missouri Public Expenditure Survey, amicus curiae.

DALTON, Chief Justice.

Original proceeding in mandamus. Relator seeks to compel the State Auditor to

register certain bonds, as hereinafter stated. The cause has been submitted on the pleadings, briefs and an agreed statement of facts.

On May 3, 1955, the 68th General Assembly by resolution ordered submitted to the qualified electors of the State an Amendment to the Constitution authorizing the issuance by the State of bonds up to $75,000,000 for certain purposes, as set forth in the Amendment, which Amendment was to be designated Sec. 37(a), Art. III, Constitution of Missouri. See Laws 1955, p. 867, V.A.M.S.Const. § 37(a), Art. III.

Thereafter, the General Assembly passed an Act authorizing the issuance and sale of the bonds to the amount of $75,000,000 by the State of Missouri in accordance with the provisions of the proposed Amendment and further, providing that said Act should become effective upon approval of the said Amendment by the electors of the State. Laws 1955, p. 769, V.A.M.S.Const. Art. 3, § 37(a). note. Thereafter, the Governor issued his proclamation on November 9, 1955, calling a special election on January 24, 1956, to vote upon the proposed Amendment. At the special election so held, the Amendment was approved by a majority of 67,961. On February 15, 1956, the Governor issued his proclamation declaring the result of the election and that the Amendment had been adopted. See Section 125.070, RSMo 1949, V.A.M.S.

On June 7, 1956, the Board of Fund Commissioners (See Sections 33.300 to 33.540 RSMo 1949, V.A.M.S.) adopted a resolution issuing the first series of bonds to the amount of $10,000,000 pursuant to said Constitutional Amendment and Bond No. 1 was presented to the State Auditor, respondent herein, for registration. Laws of Missouri 1955, pp. 769, 772, Sec. 3, provides that when the said bonds should be issued, they should be registered in the office of the State Auditor; and that "he shall endorse on each bond his certificate that in the issuance thereof all of the conditions of the law have been complied with, and shall sign such certificate and authenticate the same with the seal of his office." Registration of the bond was refused for the reasons stated in respondent's amended return herein. Respondent contends that the bonds should not be registered, nor the said certificate be executed.

The grounds for refusal to register the bonds are that the law has not been complied with; and that the so-called Sec. 37(a), Art. III was not validly enacted; (I) That the election at which the Amendment was sought to be submitted on January 24, 1956, was invalid (a) because the Constitutional Amendment was not published in the mode and manner required by Sec. 2(b), Art. XII of the Constitution; and (b) because the ballot title failed to state fully the purpose of the Amendment; (II) That while the proposal was submitted in the form of a Constitutional Amendment it is not in substance a Constitutional Amendment, but is a proposition that the State should incur indebtedness and issue bonds and "the proposal combined into one proposition the incurrence of indebtedness and the issuance of bonds of the State for distinct and different purposes not germane one to the other" and which have no natural relationships; and (III) That the proposed Amendment amended more than one Article of the Constitution and violated Sec. 2(b), Art. XII of the Constitution.

█ Whether the prescribed procedure for amending the Constitution has been followed and whether the Constitution has been validly amended is a judicial question. Edwards v. Lesneur, 132 Mo. 410, 434, 33 S.W. 1130, 31 L.R.A. 815; State v. McBride, 4 Mo. 303, 306.

The Missouri Public Expenditure Survey, a non-profit corporation, has been permitted to intervene as amicus curiae and has filed a brief seeking to have the Amendment declared void because of alleged failures to comply with constitutional provisions. Amicus curiae urges substantially the same points as respondent, but in different order.

Section 37, Art. III of the Constitution provided a limitation on state debts and bond issues, as follows: "The general assembly shall have no power to contract or authorize the contracting of any liability of the state, or to issue bonds therefor, except (1) to refund outstanding bonds * * * (2) on the recommendation of the governor, for a temporary liability to be incurred by reason of unforeseen emergency or casual deficiency in revenue, * * * and (3) when the liability exceeds one million dollars, the general assembly as on constitutional amendments, or the people by the initiative, may also submit a measure containing the amount, purpose and terms of the liability, and if the measure is approved by a majority of the qualified electors of the state voting thereon at the election, the liability may be incurred * * *." V.A.M.S.Const. art. 3, § 37.

It will be noted that by reason of the above section, the General Assembly has no power to contract or authorize the contracting of any liability of the state, or to issue bonds therefor, except as stated therein, and when the liability exceeds one million dollars a measure may be submitted containing the amount, purpose and terms of liability for approval or rejection by a majority of the qualified electors of the state voting thereon at the election.

In this instance the 68th General Assembly submitted the proposed Amendment for the $75,000,000 bond issue by Senate Joint Resolution No. 9, which, including title, covers some three printed pages. The title of the resolution stated the purpose of the proposed Amendment as follows: " * * * to authorize the General Assembly to contract a debt or liability on behalf of the state of Missouri and to issue bonds of the state of Missouri to an amount not exceeding Seventy-five Million Dollars ($75,000,000) for the purpose of repairing, remodeling or rebuilding, or repairing, remodeling and rebuilding state buildings and properties at all or any of the penal, correctional and reformatory in-

stitutions of this state, the state training schools, state hospitals and state schools and other eleemosynary institutions of this state, and institutions of higher education of this state, and for building additions thereto and additional buildings where necessary, and for furnishing and equipping any such improvements * *."

The Act of the 68th General Assembly, Laws 1955, p. 769, providing for the issuance of the bonds in the event the proposed Amendment should become effective upon approval by the electors of the state, carried a title in which was reviewed the same purposes as stated in the proposed Amendment and added the following also from the proposed Amendment: " * * * providing for the creation of the Second State Building Bond Interest and Sinking Fund; providing for the payment of the portion of the proceeds of the state income tax into such fund; providing for the levying and collection of a direct annual tax upon all taxable tangible property in the state to pay the principal and interest of the bonds where the proceeds of the income tax are insufficient; providing for the payment of interest on and redemption of said bonds by the Board of Fund Commissioners * * *."

We shall not consider respondent's points in the order in which they were submitted, but shall consider the ballot title first. Was the election invalid on the ground that "the ballot title failed to state fully the purpose of the Amendment?" Respondent says "the ballot title failed to give a true and intelligent statement of the purposes of the proposed constitutional amendment." The only authority cited in support of this contention is Section 125.030, RSMo 1949, V.A.M.S. This section provides that, when a Constitutional Amendment is proposed, the Secretary of State shall send a copy to the Attorney General who "shall provide and return to the secretary of state an official ballot title for such proposed constitutional amendments. The official ballot title may be distinct from the

legislative title of such proposed constitutional amendment and shall express in not exceeding twenty-five words the purpose of such proposed constitutional amendment. * * * Any citizen who is dissatisfied with the official ballot title provided by the attorney general * * * may appeal from his decision to the circuit court by petition within ten days * * * No appeal shall be allowed from the decision of the attorney general on an official ballot title unless the same is taken within ten days after such decision is filed with the secretary of state."

The official ballot title transmitted to the secretary of state was as follows: "Proposed Constitutional Amendment Number 1 (Submitted by the 68th General Assembly)

"Amendment to Article III of the Constitution adding a new section thereto to be known as Section 37(a) authorizing the General Assembly to issue $75,000,000 in bonds to build, rebuild, repair or remodel buildings at state eleemosynary and educational institutions."

No citizen took an appeal to the circuit court from the decision of the attorney general concerning the form of the ballot title.

It is apparent that, in order to reduce the stated purpose of the proposed Amendment (covering some 2½ pages of printed matter) to twenty-five words, only a very general statement of purpose could be made. The principal purpose of the proposed Amendment was to authorize the General Assembly to issue $75,000,000 in bonds because Sec. 37, Art. III of the Constitution expressly provided that the General Assembly had "no power to contract or authorize the contracting of any liability of the state, or to issue bonds therefor," except under the exceptions mentioned, which did not apply, and the proposed liability and bond issue exceeded one million dollars. The proposed use of the bond money or any limitations thereon was not prohibited by Sec. 37, Art. III, but the amount, purpose and terms of the proposed liability or bonds were required to be stated in the measure or amendment authorizing the liability or the issuance of the bonds. Except for the constitutional limitation on the amount, no amendment or constitutional authorization would have been required. The primary purpose of the amendment was to secure this authorization and such purpose was fully stated. A full statement of the proposed use of the funds sought to be obtained could not have been stated in the remaining number of words available. Even the addition of alleged omitted words "penal, correctional and reformatory institutions of the state, the state training schools" would have required a title in excess of twenty-five words. The title furnished constituted a substantial and sufficient compliance with the statute. There is no suggestion that the attorney general did not, "to the best of his ability, give a true and impartial statement of the purposes of the proposed constitutional amendment." No citizen availed himself of the right of appeal to the circuit court, which was the remedy provided by the statute. The election was not invalid by reason of any failure of the ballot title to fully state the purpose of the amendment.

Was the alleged adoption of the amendment invalid on the ground that more than one constitutional amendment was submitted at the special election without being submitted so as to enable the electors to vote on each amendment separately? Section 2(b), Art. XII of the Constitution, in part, provides: "More than one amendment at the same election shall be so submitted as to enable the electors to vote on each amendment separately." In Gabbert v. Chicago, R. I. & P. Ry. Co., 171 Mo. 84, 97, 105, 70 S.W. 891, 897, the court said: "The requirement that amendments shall be separately submitted is mandatory," and the court held that whether two amendments were jointly submitted or only one was a judicial question.

It is contended by respondent that by reason of a violation of this provision the

amendment in question, Sec. 37(a), Art. III, has not been validly enacted, because the proposal combined into one proposition the incurrence of indebtedness and the issuance of bonds of the state for distinct and different purposes not germane one to the other; and because the proposal to contract liabilities and issue bonds of the state for building improvements at state institutions of widely different character and with widely different scopes and purposes was the submission of more than one amendment, which should have been so submitted as to enable the electors to vote on each amendment separately. It is urged that the measure submitted " * * lacks the character of a constitutional amendment * * * does not contain the principles upon which the government is founded, does not regulate the division of sovereign powers or direct to what purpose each of these powers is entrusted and the manner of its exercise * * *, but merely authorized the issuance of bonds of the state for various different purposes and submits the amount, purpose and terms of the liability. It is also contended that "Joint Resolution No. 9 submitted a proposition for building improvements for state institutions operating under statutes, distinct one from the other, and having purposes, objects and scope, distinct, one from the other." Reference is made to Chapters 172, 174, 175, 191, 192, 216, 217 and 219, RSMo 1949, V.A.M.S., dealing with the different institutions covered by the resolution. It is argued that "the question of whether or not questions, distinct and not related, one to the other, were submitted to the people as a single proposition, is of the essence of a fair and honest election."

The contention that the measure submitted is in the form of a constitutional amendment, but is not such in substance and that it is rather a proposition that the state should incur indebtedness and issue bonds is of no merit. The measure purports to add an additional exception to Sec. 37, Art. III to authorize the issuance of bonds to the extent stated and to provide for their payment. The essential and decisive question is whether the measure is valid in form and substance and was validly submitted and adopted.

The measure submitted reads, in part, as follows: "Section 37(a). In addition to the exceptions made in Section 37, the General Assembly shall have power to contract, or to authorize the contracting of, a debt or liability on behalf of the state, and to issue bonds or other evidence of indebtedness therefor, not exceeding in the aggregate Seventy-five Million Dollars ($75,000,000), for the purpose of repairing, remodeling or rebuilding, or of repairing, remodeling and rebuilding state buildings and properties at all or any of the penal, correctional and reformatory institutions of this state, the state training schools, state hospitals and state schools and other eleemosynary institutions of this state, and institutions of higher education of this state and for building additions thereto and additional buildings where necessary, and for furnishing and equipping any such improvements. * * *

"Such bonds shall be issued by the State Board of Fund Commissioners in such amount, from time to time, as may be necessary to carry on the building program as determined by the General Assembly. The proceeds of the sale or sales of any bonds issued hereunder shall be paid into the state treasury and be credited to a fund to be designated the 'Second State Building Fund'. The proceeds of the sale of the bonds herein authorized shall be expended for the purposes for which the bonds are hereinabove authorized to be issued. * * * The General Assembly shall enact such laws as may be necessary to carry this amendment into effect." Senate Joint Resolution No. 9, Laws 1955, p. 867.

■ The rule of law relied upon by respondent is well stated in Hart v. Board of Education, 299 Mo. 36, 39, 252 S.W. 441, 442, and in State ex rel. Becker v. Smith,

335 Mo. 1046, 1049, 75 S.W.2d 574, 575, as follows:

"The vice of "doubleness" in submissions at elections is universally condemned. It is regarded as a species of legal fraud because it may compel the voter, in order to get what he earnestly wants, to vote for something which he does not want. State [ex inf. Barrett ex rel. Callahan] v. Maitland, 296 Mo. 338, 246 S.W. 267, 272. The rule inhibiting doubleness has been tersely stated as follows:

" 'Two propositions cannot be united in the submission so as to have one expression of the vote answer both propositions, as voters may be thereby induced to vote on both propositions who would not have done so if the questions had been submitted singly.' 21 Enc.Law (2d Ed.) 47. The soundness of the general doctrine embodied in this rule has not been questioned by any decision of this court. State ex rel. [Pike County] v. Gordon, 268 Mo. 321, 188 S.W. 88. * * * Strange as it may seem, it is often difficult to determine whether a submission with respect to the issuance of bonds for municipal (or school district) improvements is single or double. If it can be said that the proposed improvements are not naturally related or connected, then it is clear that separate submissions are required; if, on the other hand, the several parts of the project are plainly so related that, united, they form in fact but one rounded whole, it is equally clear that they may be grouped together and submitted as one proposition. * * *."

The rule is stated in Moore v. Brown, 350 Mo. 256, 165 S.W.2d 657, 662, as follows: "Furthermore, if the amendment be double or multifarious the defect is *substantive*, and the measure will be void even if adopted, * * * The theory is that the people ought not to be required to vote on two or more separate propositions as one, so that they must either accept or reject both; also that such a course permits logrolling. * * *." Respondent

also cites State ex rel. City of Joplin v. Wilder, 217 Mo. 261, 116 S.W. 1087; State ex rel. City of Bethany v. Allen, 186 Mo. 673, 85 S.W. 531; State ex rel. Pike County v. Gordon, 268 Mo. 321, 188 S.W. 88.

■ Respondent argues that the Amendment now before the court is practically speaking "a blank check to authorize the General Assembly to make building improvements for virtually all the institutions of the state other than those directly connected with the state government, such as state office buildings, court building and the capitol." Respondent says that, "The only limitation upon the expenditure of this money set out in the proposed amendment is that it is to be for building improvements." We agree that the amendment gave the General Assembly the authority to determine the building program, subject only to the limitation imposed, to wit, the limitation on the amount and the limitation that the proceeds of the sale of the bonds could be expended only "for the purposes for which the bonds are hereinbefore authorized to be issued." The proceeds of the bonds could be used for building improvements at any or all of the various state institutions referred to.

Respondent's theory, as stated, is that the amendment was not validly adopted because more than one amendment was submitted without the amendments being submitted so that the electors could vote on each amendment separately; that the voters were not given a free and equal opportunity to vote on the proposed building improvements for the respective state institutions; and that "voters who wished to restore and improve the penitentiary buildings were forced to accept the proposition as a whole, including the building program for all other eleemosynary or educational institutions of the state." Respondent's theory is not supported by the provisions of the amendment voted upon. No building improvements were proposed, ordered or directed for any particular institution and no amount of bonds or funds

were allotted to or set aside for the benefit of any particular institution. The extent of the building program, the amount, type of buildings, the selection of their location and all such matters rested within the sole discretion of the General Assembly and the extent of the building program would determine the amount, if any, of the bonds. The Amendment, by its terms, made no allotment of funds to any one of the alleged twenty-three institutions claimed to be within the purview of the amendment. The amendment only gave the General Assembly power "to contract, or to authorize the contracting of, a debt or liability on behalf of the state, and to issue bonds or other evidence of indebtedness therefor," all with only two limitations, (1) that the amount should not exceed $75,-000,000 and (2) that the proceeds should be expended "for the purposes for which the bonds are hereinabove authorized to be issued."

It was the duty of the state to promote the general welfare of its citizens and to provide adequate buildings and facilities to promote the functions of government in which the state was engaged. The granting of authority to the General Assembly to incur liability and issue bonds to provide funds to build, repair, remodel, furnish and equip the several state institutions, maintained and operated by the state in the discharge of the functions of government, was not the submission of many or different propositions merely because the different state institutions were located at different places and were intended to serve different purposes or functions.

The Amendment expressly limits the amount of liability which may be incurred and, further, states the purpose for which the funds may be used. The General Assembly had the authority to determine the needs of the respective institutions and the amendment purports to give it the authority to incur liability, issue bonds and allocate the proceeds of the bonds between the several institutions enumerated, in ac-

cordance with the building program adopted.

In Willis v. School Dist. of Sedalia, 299 Mo. 446, 253 S.W. 741, 743 (quoted in State ex rel. Becker v. Smith, supra, 75 S.W.2d 574, 576), the court said: "'The oneness and singleness of the plan to build schoolhouses in a school district is shown by the very necessities of the case as distinguished from the courthouse case. The directors of the district were obliged to prepare school facilities for all the children of the district impartially as one undertaking. The notice comprehending the school buildings for the district as a whole was as single as the purchase of furniture for the different rooms of the same schoolhouse. The fact that the buildings should be located at convenient points in different parts of the district does not make the scheme multiple any more than if all the buildings were grouped together in one place.'" And see Gabbert v. Chicago, R. I. & P. Ry. Co., supra, 171 Mo. 84, 108, 70 S.W. 891. We hold that when Sec. 37 (a), Art. III, was submitted a single proposition was submitted to the voters for acceptance or rejection. State ex rel. Becker v. Smith, supra; Willis v. School Dist. of Sedalia, supra, 253 S.W. 741, 742; Hart v. Board of Education, 299 Mo. 36, 252 S.W. 441, 442.

Respondent's next contention is that "the proposed amendment * * * amended more than one Article of the Constitution and that in so doing violated Sec. 2(b) Art. XII, of the Constitution." It is first pointed out that the power to appropriate money and levy taxes is vested in the General Assembly by Sec. 36, Art. III, and Secs. 23 and 28, Art. IV of the Constitution. It is then insisted that the provisions of the amendment requiring the transfer of funds from the proceeds of the income tax and, if such proceeds should be insufficient for the purpose, requiring the levy of a tax upon the sole authority of the comptroller deprives the General Assembly to that extent of powers granted

to it by the Constitution. It is further said that the amendment deprives the General Assembly of the power to appropriate a certain amount of the state revenue to the extent necessary to service the indebtedness as the appropriation is made by the amendment and not by the General Assembly, thereby, amending Secs. 23 and 28 of Art. IV of the Constitution. It is further said the provisions of the amendment concerning loans from the General Revenue Fund to be made for the purpose of paying principal or interest, without *expressly* requiring that prior provision be made for free public schools, amends and changes Sec. 3(b), Art. IX. It is also pointed out that Sec. 1, Art. X, of the Constitution of Missouri provides that the taxing power may be exercised by the General Assembly for state purposes and it is then insisted that the proposed amendment amends Sec. 1, Art. X, and vests the taxing power in an executive officer. Before considering these contentions it should be noted that the amendment expressly provides "The General Assembly shall enact such laws as may be necessary to carry this amendment into effect"; and that legislation has been enacted, Laws 1955, p. 769; and the appropriations were made by the Extra Session of the Legislature in 1956. Laws 1955, Extra Session, p. 1 et seq.

Section 2(b), Art. XII of the Constitution, upon which respondent relies, provides, in part, that "No such proposed amendment shall contain more than one amended and revised article of this constitution, or one new article which shall not contain more than one subject and matters properly connected therewith." It will be noted that the amendment in question does not purport to be an amended or revised article, nor a new article, but only an amendment of Sec. 37, Art. III, by adding a further exception to the limitations imposed by Sec. 37, Art. III, which, except for the authority granted by the exceptions, provides that the General Assembly shall have no power to contract or authorize the contracting of liability of the state, or to issue bonds therefor. However, if we assume that the amendment be either an amended and revised article or a new article, it is a single amendment and contains no "more than one subject and matters properly connected therewith." Sec. 2(b), Art. XII.

Respondent admits that the proposed amendment provided means for the payment of the bonds which were to be issued. It is these provisions to safeguard the payment of the bonds which respondent says amended more than one article of the Constitution, which in turn, respondent says, was contrary to Sec. 2(b) of Art. XII. Respondent reviews these provisions, as follows: "The Comptroller is required to transfer, at least monthly, the proceeds of the state income tax, after deducting therefrom the proportionate part thereof appropriated for the support of the free public schools, to the credit of the (Second) State Building Bond Interest and Sinking Fund until there shall have been transferred to said Fund the amount certified to him by the State Board of Fund Commissioners as the amount of money required for the payment of interest on the bonds for the next succeeding fiscal year and for the maintenance of a sinking fund to pay said bonds maturing in such next succeeding fiscal year. If, at any time after the issuance of any of the bonds, it should become apparent to the State Comptroller that the proceeds of the State income tax will not suffice for the payment of the principal and interest maturing and accruing on said bonds during the next fiscal year, a direct tax shall be levied on all taxable tangible property in the State for the payment of said bonds and the interest that will accrue thereon. The State Comptroller is then directed to determine the rate of taxation necessary and to certify that rate to the County Clerk of each County in the State and the Comptroller or other appropriate official in the City of St. Louis. It is then

The amendment further provides for transfer of funds from the State Revenue Fund and for subsequent re-transfer and further provides that "All funds paid into the Second State Building Bond Interest and Sinking Fund shall be and stand appropriated without legislative action to the payment of principal and interest of said bonds. * * *."

Respondent relies upon the matters mentioned in Moore v. Brown, supra, particularly at 165 S.W.2d 657, loc. cit. 664, where the court had under consideration whether an amendment proposed by petition for submission to popular vote (under the power of initiative reserved to the people) complied with Sections 12287 and 12289, RSMo 1939, Sections 126.030, 126.050 RSMo 1949, V.A.M.S., requiring constitutional changes to be shown, as such sections were construed to require in the case of State ex rel. Halliburton v. Roach, 230 Mo. 408, 130 S.W. 689. In the Moore case the court said: "We therefore hold said requirements of Secs. 12287 and 12289 are not substantive, and that an amendment cannot be held void after adoption because such requirements were disregarded." [350 Mo. 256, 165 S.W.2d 663] We think the Moore and Halliburton cases have no application under the facts of this case to the issues in question here. No such statutes are applicable here and we are pointed to no constitutional provision prohibiting an amendment of a section by a section dealing with one subject and matters properly connected therewith, unless Sec. 2(b), Art. XII was intended to and does prohibit an amendment such as Sec. 37(a), Art. III. See Marsh v. Bartlett, 343 Mo. 526, 121 S.W.2d 737, 742(8).

█ As stated, respondent complains of that part of Sec. 37(a), Art. XII which makes adequate provision for the payment of the bonds and the interest thereon. While these provisions may to some extent modify certain other provisions of the Con-

stitution, the people of the state had the right to amend the Constitution in such manner as was thought desirable, so long as it was done in compliance with the terms of the existing Constitution. 16 C. J.S., Constitutional Law, § 7, p. 32. "It is fundamental that the people, themselves, are bound by their own Constitution * *. Where they have provided therein a method for amending it, they must conform to that procedure. Any other course would be revoluntiary the cases have said." Moore v. Brown, supra, 165 S.W.2d 657, 659. But as stated in Moore v. Brown, supra, 165 S.W.2d 657, 662, "The general rule is that one constitutional amendment may change several articles or sections of a Constitution, if all these changes are germane to a single controlling purpose." And see Gabbert v. Chicago, R. I. & P. Ry. Co., 171 Mo. 84, 101, 105, 70 S.W. 891. And of course "a clause in a constitutional amendment will prevail over a provision of the constitution or earlier amendment inconsistent therewith, since an amendment to the constitution becomes a part of the fundamental law, and its operation and effect cannot be limited or controlled by previous constitutions or laws that may be in conflict with it." 16 C.J.S., Constitutional Law, § 26, p. 99; State ex rel. Lashly v. Becker, 290 Mo. 560, 235 S.W. 1017, 1020.

█ We must and do hold that we find nothing in Sec. 2(b), Art. XII of the Constitution prohibiting an amendment of the Constitution by a section such as Sec. 37 (a), Art. III, which authorizes the issuance of bonds and makes provision for their subsequent payment by provisions which to some extent modify other provisions of the Constitution.

Lastly, we consider respondent's contention that "the publication of the amendment and the giving of notice of the election are of the essence of the submission of any question to the people"; and that the "failure to comply with the requirements of the constitution and of law invalidated

the election at which the amendment was submitted."

Section 2(b), Art. XII of the Constitution, with reference to publication of proposed amendments, provides: "If possible, each proposed amendment shall be published once a week for two consecutive weeks in two newspapers of different political faith in each county, the last publication to be not more than thirty nor less than fifteen days next preceding the election. If there be but one newspaper in any county, publication for four consecutive weeks shall be made."

The constitutional provision as to publication of proposed amendments was further supplemented by Section 125.010 RSMo 1949, V.A.M.S., as follows: "The secretary of state shall designate in what newspaper or newspapers in each county amendments proposed by the general assembly * * * shall be published. If possible, each proposed amendment shall be published once a week for two consecutive weeks in two newspapers of different political faith in each county, the last publication to be not more than thirty nor less than fifteen days next preceding the election. If there is but one newspaper in any county, publication for four consecutive weeks shall be made, the last publication to be not more than thirty nor less than fifteen days next preceding the election. If there are two or more newspapers in a county, none of which is of different political faith from another, then each proposed amendment shall be published once a week for two consecutive weeks in any two newspapers in the county, the last publication to be not more than thirty nor less than fifteen days next preceding the election."

The applicable facts on the issue presented are stipulated in an agreed statement as follows: On November 9, 1955, the Governor issued his proclamation calling a special election to vote on the proposed amendment on January 24, 1956. During the period between these dates one or more newspapers of general circulation and qualified to publish legal notices were continuously published in each county in the state and in the city of St. Louis. On December 12, 1955, the Secretary of State certified for publication a copy of the proposed amendment to the newspapers throughout the state designated by him under Sec. 125.010, supra. The certification was accompanied by a letter on behalf of the Secretary of State, signed by his Chief Clerk, which letter, in part, contained erroneous, incomplete and conflicting instructions with reference to publication, as follows: "Two insertions are required in counties with at least two newspapers. Four insertions are necessary in counties with only one newspaper. The statutes provide that the last publication shall be not more than thirty days or less than fifteen days before the election. Thus, for newspapers publishing two insertions, the first should be printed in an issue during the week of December 19th and the last not later than during the week of January 9th. Naturally, the dates in counties with only one newspaper will be left to the discretion of those editors—as long as the last insertion precedes election day."

It will be noted that no instructions as to publication in consecutive weeks was given; that publication within less than fifteen days was authorized by the reference to "the week of January 9th"; and that incomplete and erroneous directions were given for counties with only one newspaper.

■ The proposed amendment was published in literal conformity with Sec. 2(b), Art. XII of the Constitution and Sec. 125.010 RSMo 1949, V.A.M.S., in all counties of the state, except as follows: In twenty-seven specified counties the last publication was made less than fifteen days next preceding the election. In twenty-six counties the publication was not in consecutive weeks in one or both newspapers. In Laclede and St. Louis counties there was publication in only one newspaper, although at least two newspapers were published in

each of these counties. Some counties are listed more than once, because publication was defective on more than one ground, but it is only contended that publication was defective in forty-seven counties. In the city of St. Louis (which is a county, Sec. 31, Art. VI of the Constitution) the St. Louis American and the Labor Tribune, weekly newspapers, were designated by the Secretary of State and publication was made therein, although neither paper was a paper of general circulation in the city (see Section 493.070 RSMo 1949, V.A.M.S.), nor had either paper been certified under Section 493.080 RSMo 1949, V.A.M.S., as qualified to publish notices by judges of the circuit court of the city of St. Louis. And see Section 493.090 RSMo 1949, V.A.M.S. It is admitted that the circulation of the St. Louis American was chiefly among the colored population and that of the Labor Tribune was among the members of labor unions affiliated with the American Federation of Labor. Of course, Section 125.010 RSMo 1949, V.A.M.S., providing for publication, under certain circumstances, "in any two newspapers in the county," if applicable under the facts, would control over Sections 493.070 and 493.090 RSMo 1949, V.A.M.S., since Sec. 125.010 specifically related to the publication of proposed amendments to the Constitution. Fleming v. Moore Bros. Realty Co., 363 Mo. 305, 251 S.W.2d 8.

In all of the designated papers the publication of the amendment was accompanied by a heading stating the date and purpose of the special election and showing the title of the proposed amendment as submitted by the Attorney General.

It is admitted that the substance of the amendment and the date and places of holding the election thereon were widely publicized throughout the state in newspaper articles, advertisements and by other media of information. While not directly admitted, it clearly appears that there was newspaper publication of the amendment in every county of the state and in the city of St. Louis and, of course, the circulation of newspapers was not limited by county lines.

There is no suggestion that Section 125.020 RSMo 1949, V.A.M.S., with reference to the posting of notices and as to copies of the amendment at voting places in the state was not complied with. It is admitted that on November 14, 1955, the ballot title of the amendment was certified to the county clerks of the respective counties or to the proper election officials as provided by Section 125.040 RSMo 1949, V.A.M.S., and there is no contention that the ballot title and notice of the special election was not published as provided by Section 120.580 RSMo 1949, V.A.M.S. See State ex rel. State Highway Commission v. Thompson, 323 Mo. 742, 19 S.W.2d 642, 646(6). The vote was favorable to the amendment in 94 counties of the state and in the city of St. Louis. The total vote in the state was 114,570 for the amendment to 46,609 against.

The parties have further stipulated: "A comparison was made of the vote in those counties in which the Amendment was published in literal compliance with constitutional and statutory provisions and with the vote in those counties in which the Amendment was not so published. The results are as follows:

"Percentage of population voting for Governor in 1952 . . . . . . . . . 47.31
"Percentage of population voting on Amendment where publication was in strict compliance with statutory and constitutional provisions . . . . . . . . . . . . . . . . . . . . . . 5.53
"Percentage of population voting on the Amendment where publication was otherwise . . . . . . . . . . . 3.53
"Percentage of vote on Amendment of vote for Governor in counties where publication was in strict compliance with statutory and constitutional provisions . . . . . . . 11.49
"Percentage of vote on Amendment of vote for Governor in counties where publication was otherwise 7.52."

Respondent argues, as follows: "That all constitutional provisions are mandatory is a basic principle of constitutional law. A constitution is a fundamental document and its provisions are not to be disregarded. The Constitution of Missouri could have left the mode and manner in which the public is to be given information concerning the pendency of a constitutional amendment and of the contents of the proposed amendment to the Legislature or to the members of a constitutional convention, but that the Constitution did not choose to do. It chose, rather, to prescribe expressly what information should be given and how and when it would be given. By approval of the Constitution containing these requirements, the people of the State have bound not only the General Assembly and the executive officers, but have bound themselves to a certain specified manner in which the Constitution is to be amended. To hold that such provisions are directory only or to hold that they can be disregarded would be to authorize a manner of amending the Constitution which not only would not be lawful but would be revolutionary." Moore v. Brown, supra.

Respondent argues that 72 percent of the entire population of the state lived in counties where the Amendment was improperly published; that in the city of St. Louis and in Jackson County the daily papers of large circulation, such as the Globe Democrat, the Post Dispatch and the Kansas City Star and Times were ignored; and that there was no substantial compliance with the constitutional provisions or statutes as to the giving of information to the voters. Respondent further insists that no method of amendment can be tolerated which does not provide the electorate adequate opportunity to be fully advised of proposed changes; and that it is vital that the people be given complete information in the manner required by the Constitution and Laws of the state.

In support of his contention that the failure to comply with the constitutional requirements invalidated the election, respondent cites: Cooley's Constitutional Limitations, 8th Ed., Vol. I, p. 158; 11 Am.Jur. 638, Sec. 32; McCreary v. Speer, 156 Ky. 783, 162 S.W. 99; Arnett v. Sullivan, 279 Ky. 720, 132 S.W.2d 76; State ex rel. Woods v. Tooker, 15 Mont. 8, 37 P. 840, 25 L.R.A. 560; State ex rel. Hall v. Cline, 118 Neb. 150, 224 N.W. 6; Commonwealth ex rel. Schnader v. Beamish, 309 Pa. 510, 164 A. 615; Gabbert v. Chicago, R. I. & P. Ry. Co., supra; State ex rel. City of Berkeley v. Homes, 358 Mo. 1237, 219 S.W.2d 650. The Gabbert case states that the mode established by the Constitution for its amendment must be followed and holds that "The requirement that amendments shall be separately submitted is mandatory." [171 Mo. 84, 70 S.W. 897]

The case of State ex rel. City of Berkeley v. Holmes is not applicable to the facts here, That case applied the rule that strict compliance with statutory provisions for *time of notice* is essential to the validity of a special election authorizing an increase in the indebtedness of the city and held that the *time of notice* specified in the statute was a mandatory requirement, which must be complied with to have a valid election. Space does not permit a review of other cases cited by respondent or amicus curiae. The portion of Sec. 2(b), Art. XII relied upon by respondent does not require the giving of any notice of any election. The provision, as respondent subsequently concedes, only prescribes "what information should be given and how and when it would be given." Respondent also admits that "the Missouri Constitution says nothing about notice of a special election," but he contends that "the General Assembly failed to step in and regulate the matter." The purpose of the publication required by the Constitution, apparently, is to furnish information of the terms and provisions of the proposed amendment to be voted upon.

It is admitted that "this court has held that a trivial and inconsequential departure from the constitutional requirements as to its amendment will not invalidate an election, particularly where the departure affect-

ed only a very trivial number of eligible voters." Respondent refers to Fahey v. Hackmann, 291 Mo. 351, 237 S.W. 752, 760 (improper publication in one county) and State ex rel. State Building Commission v. Smith, 335 Mo. 840, 74 S.W.2d 27, 29(6) (improper publication in one county). In the latter case the court said: "The failure of the publisher of said newspaper to literally comply with this provision of the Constitution did not invalidate the election regularly held in the other counties in the state. If it did so, a newspaper publisher, under contract to publish the notice, could intentionally or negligently defeat any proposed amendment to the Constitution." And see State ex rel. Morgan v. O'Brien, 134 W.Va. 1, 60 S.E.2d 722, 727; Whiteside v. Brown, Tex.Civ.App., 214 S.W.2d 844, 848(5).

Other authorities cited by relator are placed by respondent in the same class, as approving substantial compliance with constitutional provisions, as follows: Tausig v. Lawrence, 328 Pa. 408, 197 A. 235; Hammond v. Clark, 136 Ga. 313, 71 S.E. 479, 38 L.R.A.,N.S., 77; Mayer v. Adams, 182 Ga. 524, 186 S.E. 420; State ex rel. Hay v. Alderson, 49 Mont. 387, 142 P. 210; State ex rel. Thompson v. Winnett, 78 Neb. 379, 110 N.W. 1113, 10 L.R.A.,N.S., 149; Herold v. Townsend, 113 W.Va. 319, 169 S.E. 74, 75; Manos v. State, 98 Tex.Cr.R. 87, 263 S.W. 310; Yenter v. Baker, 126 Colo. 232, 248 P.2d 311; Whiteside v. Brown, supra, 214 S.W.2d 844, 849; Swanson v. State, 132 Neb. 82, 271 N.W. 264.

Section 2, Art. XV of the Constitution of 1875, V.A.M.S., expressly provided that "Each proposed amendment shall be published once a week for four consecutive weeks next preceding such election, in at least one newspaper in each county of the state where a newspaper is published." As indicated, this court has held that substantial compliance with this constitutional mandate was sufficient, but that provision has now been changed. Section 2(b) Art. XII of the present constitution has added the words "if

possible" and made other changes. We must determine their significance. Section 125.010, supra, also uses the words, "if possible." It is interesting to note that the record of the Constitutional Convention debates indicates that when a member asked about the application of a proposed form to a county where newspapers were of one faith, it was said that this was the reason for the words "if possible" and that these words were intended to mean that "the official charged with publication would try to carry out the Constitution to the best he could." When it was asked who would pass on whether it was possible, the reply was "I guess the Secretary of State." Transcript of Debates, 1943–1944, Const.Convention of Missouri, pp. 447–448.

We think the first question for consideration is whether, in view of the use of the words "if possible," the provisions under consideration are mandatory or directory in so far as they affect the validity of the election in question. We here consider the mentioned provisions solely with reference to a determination of whether the amendment was validly adopted.

▉ The general rule is that the provisions of a constitution regulating its own amendment are mandatory and not directory. Such has been the rule in this state, but substantial compliance is sufficient. The same general rule applies to other constitutional provisions, unless by express provision or necessary implication, a different intention is manifest. 16 C.J.S., Constitutional Law, § 61, p. 174; Gaines v. O'Connell, 305 Ky. 397, 204 S.W.2d 425, 427.

As to the meaning of the words "if possible", Stroud's Judicial Dictionary, 3rd Ed., Vol. 3, p. 2250, says that "a duty to do a thing 'if possible' means, generally, if reasonably possible in a business sense," citing English cases. In considering a statute making it the duty of any officer of any banking institution to examine its affairs "and, if possible, know its condition," the court in Forbes v. Mohr, 69 Kan. 342, 348,

76 P. 827, 829, said: "The qualifying phrase, 'if possible,' has application to the discovery of wrong conditions by reasonable examination * * * In short, the requirement of the statute is that the examination must be made, and must be of such a character as would result in a knowledge of the condition of the bank if such knowledge could possibly, within the range of reasonable frequency and thoroughness, be obtained." In a contract case, where timber was to be removed the first winter, "if possible", the court held that the words, as used in the contract should have a reasonable interpretation, having reference to the cutting and removal of the timber as a business undertaking; and that the party was excused if "in the nature of the thing it was reasonably incapable of being done." Brown v. Bishop, 105 Me. 272, 283, 74 A. 724, 729. In General Engineering & Dry Dock Co. v. East Bay Mun. U. Co., 126 Cal.App. 349, 14 P.2d 828, 834, the court said: "The meaning to be attached to such words as 'if possible,' 'as soon as possible,' 'as far as possible,' 'so far as possible,' is very frequently, as it is here in our opinion with regard to 'so far as possible,' controlled and restricted by the context, the subject-matter, and the manifest result sought to be attained under the entire scheme projected. Such restricted signification will be and should be attached where it is manifest from the context, the subject-matter, and the obvious result sought to be attained, that considerations of propriety and reasonableness involving some range of judgment and discretion, inhere." And see Vol. 20 Words and Phrases, If Possible, p. 41; Black's Law Dictionary, 3d Ed. p. 1385; 42 C.J.S. p. 377 (definition of "if"); 72 C.J.S. p. 245 (definition of "possible").

■ We think the use of the words "if possible" in Section 2(b), Art. XII of the Constitution and in Sec. 125.010 RSMo 1949, V.A.M.S., was a recognition of the possible impossibility of satisfactorily obtaining compliance with the detailed directions given for publication. The words used indicated that certain publications should be made if practicable or reasonable. The use of the term, "if possible", tended to destroy the definite, absolute and mandatory character of the provision as it existed in Sec. 2, Art. XV of the Constitution of 1875. It introduced reasonableness, practicability, judgment and discretion in the matter of compliance. Any attempt at compliance with the provisions would require the exercise of judgment and discretion. Further, we think the addition of the words "if possible", was to some extent a recognition of the possibility, even probability, of human failure, and of the fact that negligence, incompetency, accident, mistake, inadvertence or even wilful misconduct was a possibility in the office of the Secretary of State and among the officers or employees of some of the 200 newspapers of the state that might be designated by the Secretary of State to publish the amendment. Perhaps the words "if possible" were added because strict compliance with the provisions set forth might defeat the will of the majority as expressed in such an election and even defeat all efforts at any amendment. See State ex rel. Hay v. Alderson, 49 Mont. 387, 142 P. 210, 216. In any event, the provisions of the section of the Constitution and the section of the statute in question are modified by the words "if possible." These words have a purpose and a meaning and necessarily modify the provisions that would otherwise be absolute and mandatory in character. As far as the directions for publication may affect the validity of the adoption of the amendment in question, we must and do hold that the provisions in question are directory. See Hildreth v. Taylor, 117 Ark. 465, 175 S.W. 40, 41; State ex rel. Morgan v. O'Brien, supra.

■ There remains the question of whether there was substantial compliance with these directory provisions. While the issuance of conflicting, misleading and erroneous directions by the Secretary of State's office to the several newspapers, designated to carry the publication of the

proposed amendment, evidences carelessness or inattention to a matter of vital importance to the state, there is no suggestion in the record that the directions were not issued and all publications made in absolute good faith.

We attach no significance whatsoever to the tabulations upon which respondent relies in an effort to show that defective publications had some effect upon the percentage of votes cast for or against the amendment. Many factors may have entered to account for the results indicated by the figures stipulated. There is no satisfactory evidence that the defective publication was the cause of any decreased vote on the amendment.

As stated, the stipulation as to facts shows that publication of the amendment was had in one or more newspapers in every county in this state. The publications in the city of St. Louis presumably conform to the constitutional provision and special statute. Only in St. Louis County and in Laclede County the publication was in one paper when two were available. All other defects in publication were that the last publication was too late in time or that certain publications were not made in consecutive weeks. We think the record shows a sufficient and substantial compliance with these directory provisions of the Constitution.

After a careful consideration of all the issues presented we have reached the conclusion that the election was not invalid for any of the reasons urged and that the amendment was validly adopted.

Our alternative writ should be made peremptory. It is so ordered.

All concur; and all concur in the separate concurring opinion of HYDE, J.

HYDE, Judge.

I concur in all that is said in the opinion of DALTON, C. J. Furthermore, I think that the historical background of Sec. 37, Art. III, 1945 Constitution shows that the resolution of the General Assembly herein involved was a proper constitutional amendment.

If the bond issue involved had been submitted as a *measure* under subdivision (3) of Sec. 37, Art. III, 1945 Constitution we would have a different question. However, that method is not made exclusive and there is well established precedent for submitting authority for a bond issue by a constitutional amendment which adds a new exception to the limitation on legislative power to contract liability of the state and issue bonds therefor. Sec. 37, Art. III, 1945 Const.; Sec. 44, Art. IV, 1875 Const. This was done several times under the 1875 Constitution and there is nothing in Sec. 37, Art. III of the 1945 Constitution to prevent it.

Sec. 44, Art. IV, 1875 Constitution only authorized bonds (other than renewal of existing bonds) "on the occurring of an unforeseen emergency, or casual deficiency of the revenue". The burning of the State Capitol Building in 1911 was held to be such an unforeseen emergency authorizing issuance of bonds after approval by the people of an Act of the General Assembly for that purpose. Church v. Hadley, 240 Mo. 680, 145 S.W. 8, 39 L.R.A.,N.S., 248. However, thereafter the 50th General Assembly submitted two constitutional amendments adding exceptions to Sec. 44, Art. IV, 1875 Constitution, namely: an amendment adding a fourth subdivision to Sec. 44 authorizing bonds of one million dollars for a soldiers' settlement fund, Laws 1919, p. 760, which was adopted at the 1920 election, Laws 1921, p. 709; and an amendment adding Sec. 44a to the Constitution authorizing bonds for sixty million dollars for building a state system of roads, Laws 1919, p. 757, which was also adopted at the 1920 election. Laws 1921, p. 707. This latter amendment, Sec. 44a was amended to authorize an additional seventy-five million dollars in bonds for state high-

ways, submitted by initiative petition and adopted at the 1928 election. Laws 1929, p. 453. In State ex rel. State Highway Commission v. Thompson, 323 Mo. 742, 19 S.W.2d 642, 645, we held that "Section 44a adopted in 1920, was an amendment of section 44 of article 4 of the Constitution"; and further held that the amendment of Section 44a adopted in 1928 was valid although it was contended as here that it violated Sec. 2, Art. 15, 1875 Constitution, providing that "no proposed amendment shall contain * * * more than one subject and matters properly connected therewith".

There were also other similar amendments adding further exceptions to Sec. 44, Art. IV, 1875 Constitution and authorizing bond issues for other purposes. Sec. 44b was added authorizing bonds for fifteen million dollars for World War I service bonus, Laws 1921, p. 695, which was adopted at a special election held August 2, 1921. Laws 1921 Extra Session, p. 197. Its validity was upheld in Fahey v. Hackmann, 291 Mo. 351, 237 S.W. 752. Sec. 44c authorizing additional war service bonus bonds was submitted by the Constitutional Convention of 1922–23 and was adopted at a special election held February 26, 1924. Laws 1925, p. 408. Sec. 44d was added to authorize bonds for ten million dollars "for the purpose of repairing, remodeling or rebuilding, or of repairing, remodeling and rebuilding State buildings and properties at all or any of the eleemosynary or penal institutions of this State, for building additions thereto and additional buildings where necessary." Laws 1933–34 Extra Session, p. 174. This amendment was adopted at a special election held May 15, 1934 and we upheld its validity in State ex rel. State Building Commission v. Smith, 335 Mo. 840, 74 S.W.2d 27. Thus there is ample precedent and authority for adding exceptions to the limitations of legislative power to contract liability of the State and issue bonds therefor by an amendment to the Constitution such as the one herein involved.